UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:16-cv-02351-RBJ

DAVID BELL, et al.,

      Plaintiffs,

v.

Defendants, THE 3M COMPANY, et al.,

      Defendants.

---

**THE 3M COMPANY'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERTS DR. PAUL ROSENFELD AND MATT HAGEMANN**

---

Defendant The 3M Company hereby moves, pursuant to Federal Rule of Evidence 702, for an order excluding the testimony and opinions of Plaintiffs' experts Paul Rosenfeld and Matt Hagemann (collectively "the SWAPE experts").

## I.    <u>Introduction</u>

In two reports, chemist Dr. Paul Rosenfeld and geologist Matt Hagemann, offer unsupported and unreliable opinions about the sources and concentrations of alleged PFC contamination at various points within geographic boundaries of the proposed classes defined by Plaintiffs. Rosenfeld uses a "simple mixing model" to determine which "pressure zones" "had significantly elevated exposure point concentrations of PFOA/PFOS in drinking water." *See* Dkt. No. 142-1, January 24, 2018 Supplemental Report for Class Certification of PFC Contamination ("Supp. Rep.") at 18. Hagemann opines that "the use of AFFF at the Airfield has resulted in significant contamination of the drinking water resources, impacting Security, Widefield, Fountain, as well as small water systems and private wells downgradient of the Airfield." *Id.* at

17.

As shown below, these opinions fail the reliability requirement of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The SWAPE experts also make myriad incorrect, material assumptions and basic errors that negate any utility of their opinions:

- That average PFC concentrations from a narrow three-year period (2013-2016) are representative of conditions going back to 1990.
- That PFCs in each groundwater well have been at a steady state since 1990, unaffected by hydrogeological or other conditions.
- That an average PFC concentration for an entire pressure zone is representative of PFC concentrations at individual taps.
- That despite significant evidence of the existence of alternative sources of PFCs, 100 percent of the PFOA and PFOS found in the Water Districts is attributable to the Airfield.

These assumptions render it impossible for Plaintiffs to demonstrate the existence of classes of similarly situated residents entitled to medical monitoring or property damages. Further, the model relies on minimal inputs and is riddled with errors further undermining their opinions. The causation opinions of the SWAPE experts fail *Daubert* scrutiny and are inadmissible.

## II.    Background Facts and Summary of Expert Opinions

Rosenfeld is the principal environmental chemist at Soil/Water/Air Protection Enterprise ("SWAPE"), an organization that devotes 40% of its work on litigation. Dkt. No. 142-3, January 24, 2018 Revised Preliminary Report for Class Certification of PFC Contamination ("Rev. Prel. Rep.") at 23; *see also* Attached Decl. of Christopher H. Dolan ("Dolan Decl.") Ex. 1 ("Hagemann Dep.") 41:14-21. Rosenfeld has experience related to "fate and transport of environmental contaminants, risk and assessment, and ecological restoration." Rev. Prelim. Rep. at 23. Hagemann is a geologist who has worked at SWAPE since 2003. Except for a simple wellhead protection model he applied earlier in his career, he has no other experience

2

implementing groundwater models. Hagemann Dep. 32:12-24. Hagemann offers opinions regarding sources of PFCs and how PFCs allegedly were transported from the Airfield to the Water District groundwater wells. Hagemann Dep. 73:15-75:7.[1] Rosenfeld is responsible for all other opinions, including development of the simple mixing model to develop single exposure concentrations for each pressure zone in the Fountain, Security, and Widefield Water Districts.[2] *Id.* 73:6-14.

On September 21, 2017, Rosenfeld, along with James Kornberg and Hagemann, filed a "Preliminary Report for the Class Certification of PFC Contamination of Public Water Systems and Private Wells in the Security, Widefield, and Fountain, Colorado Area" ("Preliminary Report"). They revised and reissued the report on January 24, 2018 ("Revised Preliminary Report"). On the same date, SWAPE also issued a "Supplemental Report for Class Certification of PFC Contamination of Public Water Systems and Private Wells in the Security, Widefield, and Fountain, Colorado Area" ("Supplemental Report"). The Supplemental Report contains opinions that Rosenfeld and Hagemann offer in support of class certifications, including:

- The use of AFFF at the Airfield has resulted in significant contamination of the drinking water resources, impacting Security, Widefield, Fountain, as well as small water systems and private wells downgradient of the Airfield. The results from ongoing investigations of the Airfield strongly suggest that the Airfield is the most obvious source of off-site impacts.
- Based on simple mixing models and other assumptions explained in this report, Security

---

[1] Although Hagemann is identified as an author of the Preliminary Report, his involvement drafting that report was minimal. In an October 6, 2017 letter, Rosenfeld stated that "Matt Hagemann's inclusion [in the original SWAPE report] is an error and should be removed. He will not be testifying in this matter." Dolan Decl., Ex. 2. According to Hagemann, Plaintiffs' counsel asked him to become a "testifying expert" just a few weeks before the January 24, 2018 reports were submitted. Hagemann Dep. 64:4-11.

[2] A "pressure zone" is an area of a water distribution network delineated based on a specific pressure gradient. Rev. Prel. Rep at 3.

pressure zones S_l, S_2, and S_3, Widefield pressure zones W_l, W_2, and W_3, and the Fountain F_High, F_Cumberland Green, and F_Little Ranches pressure zones had significantly elevated exposure point concentrations of PFOA/PFOS in drinking water.

- Small water systems and private wells in the CDPHE's Area of Investigation have been found to have significantly-elevated concentrations of PFOA/PFOS based on limited water sampling. Some wells located more than seven (7) miles south of Fountain have PFOA/PFOS concentrations exceeding the U.S. EPA's Health Advisory level. The Proposed Class Boundary for small water systems and private wells is presented in Attachment B. The Proposed Class Boundary can be revised or expanded.

- Elevated concentrations of PFOA and PFOS in drinking water result in elevated concentrations of PFOA and PFOS in human blood serum.

- A preliminary qualitative analysis of blood data collected from a cohort of 20 individuals form the Proposed Class Area suggests that this cohort has profoundly-elevated concentrations of PFOA/PFOS in their blood serum.

Supp. Rep. at 5, 17-18. As explained below, *Daubert* and the Federal Rules of Evidence require exclusion of these opinions.

## III. <u>Governing Law</u>

Trial courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The burden of proof on these issues falls to the proponent of the expert testimony. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). To meet this burden, an expert's testimony must be based on "sufficient facts or data," be the "product of reliable principles and methods," and derive from a reliable application of those "principles and methods to the facts of the case." Fed. R. Evid. 702. The district court acts as a "gatekeeper" pursuant to Federal Rule of Evidence 702. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005).

The Tenth Circuit has explained that this gatekeeping duty centers on a two-part inquiry. *First*, a district court will find an expert's proffered testimony inadmissible unless it determines that the "testimony—whether it concerns scientific, technical, or other special knowledge—has

'a reliable basis in the knowledge and experience of his [or her] discipline.'" *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592); *see also, Morris v. DaVita Healthcare Partners, Inc.*, 2015 WL 3413419, at *1-2 (D. Colo. May 28, 2015) (Jackson, J.) (noting factors the court may consider when deciding whether an expert opinion is reliable, quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)).

   *Second*, a district court must only admit relevant expert testimony that "will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). *See also Norris*, 397 F.3d at 884. Relevance is essential: even scientifically valid evidence that employs reliable methodologies may nonetheless be inadmissible if it bears too little on "the issue at hand." *See Bitler*, 400 F.3d at 1234.

## IV.   <u>Argument</u>

   The Court should exclude the testimony of both Rosenfeld and Hagemann as unreliable. The Court should also exclude Rosenfeld's opinions as irrelevant to the class certification issues.

### A.   **Rosenfeld's opinion estimating exposure point concentrations within each pressure zone must be excluded as unreliable and irrelevant.**

#### 1.   *Rosenfeld's simple mixing model is not supported as a methodology to compute PFC concentrations over time.*

   Rosenfeld's opinions are inadmissible because his methodology cannot reliably be applied to the water distribution systems in Security, Widefield, and Fountain. Before admitting expert testimony, the Court must consider "whether the reasoning and methodology underlying the expert's opinion … is both scientifically valid and applicable to a particular set of facts." *Hall v. Conoco Inc.*, 886 F.3d 1308, 1311 (10th. Cir. 2018). Neither SWAPE report provides any information about the scientific validity or reliability of the "simple mixing" methodology

employed by Rosenfeld.

The SWAPE reports identify only one other instance in which such a mixing model has been used: a feasibility assessment of epidemiological studies at the Pease International Tradeport in New Hampshire. Supp. Rep. at 10. However, at the Pease site, the water supply system was only a small system that served the Tradeport. That system was comprised of only three water supply wells that "were mixed together and treated *__before__* entering the distribution system." Dolan Decl., Ex. 6 ("Pease Study") at 11 (emphasis added). In contrast, this case involves three water distribution systems, each comprising multiple pressure zones that receive water at different entry points from different sources. Depending on the zone, these water sources may include multiple groundwater wells, surface water pipelines, and water diversions from other pressure zones. Unlike in Pease, these sources are *__not__* all mixed together prior to entering each pressure zone. Dolan Decl., Ex. 7 ("3/14/18 Rosenfeld Dep.") 188:16-20.

The authors of the Pease Study go to great lengths to emphasize that their mixing model works only for sites "with water systems that are not complex[.]" Pease Study at 42. That is not the case here. To the contrary, SWAPE's reports describe the multiple water systems at issue— with their differing "well locations, pumping rates, water distributions to zones, blending with surface water sources, distributions between zones, and deliveries between water districts"—as "complex." Rev. Prelim. Rep. at 4. When such complex systems are at play, the authors of the Pease Study caution that "additional information is needed (for example, on the operation of the supply wells, tank levels, and the water demand in each area of the distribution system), and *__complex modeling methods must be used__*." Pease Study at 44 (emphasis added). Rosenfeld fails

to demonstrate that his methodology contains any of the indicia of reliability and scientific validity set forth in *Daubert*, such as testability, history of peer review, acceptable error rate, or general acceptance within the relevant scientific community for use *in this case*. *See* Daubert, 509 U.S. at 593-94.

### 2. *Rosenfeld lacks the data necessary to conduct a reliable analysis.*

Even if Rosenfeld's simple mixing model was a reliable methodology, he lacks critical data to reliably apply the model. Rosenfeld explained that he lacks vital facts and data to conduct a reliable analysis of the concentrations of PFCs in the various water systems. Most notably, Rosenfeld admitted that he:

- Has no data about PFOA and PFOS concentrations in groundwater prior to 2013. Rev. Prelim. Rep. at 12; Supp. Rep. at 2.
- Lacks almost any information concerning small water systems and private wells. Rev. Prelim. Rep. at 17; Supp. Rep. at 1-2 ("Due to the limited or absent information and testing data for small water systems and private (domestic) wells, exposure point concentrations have not been calculated ….")
- Has only limited data about the use of groundwater supply wells by Security, Widefield, and Fountain. Supp. Rep. at 2.
- Does not know how surface and groundwater have been mixed even though he purports to create a "mixing model": "[T]here does not appear to be sufficient data for quantifying the distribution endpoints for groundwater and surface water diversions precisely. Although there are primary sources to each specific Zone, the amount of mixing between zones is unclear." Rev. Prelim. Rep. at 16.

Even expert opinions using the most rigorous models fail *Daubert* when critical data is lacking.

*See, e.g.*, Fed. R. Evid. 702(b) (expert opinions must be "based on sufficient facts or data").

Fully aware of the many data gaps, Rosenfeld tries to save his analysis with guesswork.

*Cf. Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) ("[R]elying on intuition … won't do."). For example, when Rosenfeld could not find data about the ratios of

groundwater to surface water in pressure zones, he made it up. Despite admitting that historical data about water sources is limited or non-existent (*see* Supp. Rep. at 6-7), he purports to describe the historic mix of surface and groundwater in the various pressure zones. *See* Supp. Rep. at Exs. K-M. The Tenth Circuit holds that "[g]uesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Mitchell*, 165 F.3d at 781.

Finally, because he has no data prior to 2013, Rosenfeld simply assumes, with no support, that PFC groundwater concentrations have been steady for decades. Rosenfeld's concentration estimates are based only on a small number of sampling events for each groundwater source that were collected from 2013 to 2016. For example, of the nine wells analyzed in Widefield, each well had only between two and six sampling events. Dolan Decl., Ex. 5 ("4/3/18 Rosenfeld Dep. Ex. 264").  These samples were highly variable and some wells showed no indication of PFCs. *Id*. Rosenfeld attempts to average this data and apply it as a constant concentration back to 1990, (3/14/18 Rosenfeld Dep. 139:8-10), even though he readily admits that (i) sources of water have changed over time, (ii) blending makes it difficult to track water, (iii) significant seasonal differences exist, and (iv) "further investigations are necessary to confirm how long PFCs have contaminated the groundwater in this area." Rev. Prelim. Rep. at 3-4, 12, 13. He created date ranges for his analysis because "you have to essentially admit that there are some uncertainties to exactly what the wellhead concentrations would have been" prior to 2013. 3/14/18 Rosenfeld Dep. 135:2-136:16. While he has "much greater confidence only going back to 2012" in his calculations, he does "not know the exact concentration going back to 1990[.]" *Id*. 140:17-141:23. Although Rosenfeld justifies his approach by suggesting it is the

"best available data," he readily admits the possibility that "the levels really were significantly higher or lower in each of the wells historically." *Id*. 146:11-14.

> 3.   *Rosenfeld's implementation of his own model is so full of methodological errors that his exposure concentration estimates are unreliable.*

Rosenfeld also issued reports riddled with mistakes and selective omission of data. Even if the data and methodology had been solid, the results presented in the reports still would not be admissible because they are unreliable and unhelpful. For example, Rosenfeld admitted that he miscalculated PFC concentrations that then flowed through the results he reported. Dolan Decl., Ex. 4 ("4/3/18 Rosenfeld Dep.") 155:10–156:13. For his analysis of Widefield Well W-1, Rosenfeld concluded that the combined PFOA and PFOS concentration for a sample was 0.106 ug/L when the individual PFOA and PFOS concentrations were both zero. *Id.*; 4/3/18 Rosenfeld Dep. Ex. 264. Equally flawed, Rosenfeld ignored samples showing no PFCs because those readings did not fit his assumption that the sole source of contamination was AFFF from the Airfield. 4/3/18 Rosenfeld Dep. 159:22-161:17. Rosenfeld's analyses even include data from wells that his report elsewhere recognized no longer served the water system in question. *Id*. 146:21-149:18.

These numerous fundamental errors and omissions demonstrate that Rosenfeld's opinions derive from an unreliable application of the relevant "principles and methods to the facts of the case." Fed. R. Evid. 702. They should be excluded accordingly. *See E.E.O.C. v. Freeman*, 778 F.3d 463, 467-68 (4th Cir. 2015) (numerous errors and omissions in analysis rendered opinion "outside the range where experts might reasonably differ" and justified its exclusion) (quoting *Kumho*, 526 U.S. at 153). Another court has excluded Rosenfeld's opinions when, as here, his

analysis falls short. *Cannon v BP Products*, 2013 WL 5514284, at *7 (S.D. Tex. Sept. 30, 2013).

> **4.    *Rosenfeld's consideration of PFC concentrations only at the pressure zone level is irrelevant to class certification issues.***

Rosenfeld's proposed testimony is also inadmissible because it is irrelevant and unhelpful. Expert opinion is admissible only "when 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1150 (10th Cir. 2009) (citing Fed. R. Evid. 702). Rosenfeld's model output does not assist the trier of fact or the court assessing class certification to understand the exposure of purported class members to PFCs over time, as Rosenfeld admits: "Our current analysis indicates that within each of these water districts ***it is not presently possible*** to differentiate the exposure and dose of one customer from that of another …." Rev. Prelim. Rep. at 1 (emphasis added). In other words, Rosenfeld is unable to use his analysis of pressure zones to estimate the PFC concentrations at any individual taps and is unable to state that they are all the same, much less the same over time.

The output of Rosenfeld's simple mixing model results in an average concentration for combined PFOA and PFOS for each pressure zone.[3] Since each output tap within a pressure zone receives a different blend of water from the various water sources within a zone, the average

---

[3] Rosenfeld repeatedly testified in his deposition that his analysis does not define the scope of the classes. *See* 3/14/18 Rosenfeld Dep. 122:10–14; 4/3/18 Rosenfeld Dep. 130:22–131:6. Rosenfeld testified that he would have to rely on Dr. Stephen King to determine what "exposure point concentrations are sufficient to warrant medical monitoring[.]" 3/14/18 Rosenfeld Dep. at 70:21–71:1. King, however, conducted no such analysis (Dolan Decl., Ex. 10 ("King Dep.") 84:18-85:8) and thus there is no basis for any opinions defining class boundaries or membership in the proposed class based on point concentrations. In fact, Drs. Rosenfeld and King, along with Jim Kornberg, coordinated to avoid mentioning the EPA's advisory levels of 70 parts per trillion so the class would not be limited based on this advisory level. 3/14/2018 Rosenfeld Dep. 113:16-116:19; Dolan Decl., Ex. 8.

concentration computed by Rosenfeld does not represent the PFC concentration in any actual output to the distribution system, much less an individual water tap. As a result, the average concentration within each pressure zone tells us nothing about the actual concentrations in the drinking water received at any given time by any of the proposed class members.[4] The representatives of the various Water Districts admit, and Rosenfeld acknowledges, that they cannot predict where water from various water inputs will go within a pressure zone. 3/14/18 Rosenfeld Dep. 64:2-17; Rev. Prelim. Rep. at 5.

Rosenfeld also acknowledges that he conducted no analysis of where particular class members actually consume water, noting that the consumption could take place at home, work, or school. 4/3/2018 Rosenfeld Dep. 36:3-38:3. In other words, Rosenfeld's analysis simply assumes that class members and their properties are similarly situated. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (quotation omitted)). Since Rosenfeld's analysis provides no information about individual customers and cannot reliable predict tap water concentrations at any given time, it cannot be used to identify the members of any putative class.

> 5. *Rosenfeld's methodology for defining the Small Water Systems and Private Wells Class is unreliable.*

As to the putative class of small water systems and private well users, Rosenfeld's

---

[4] The Water Districts' representatives all testified, that PFC concentrations can vary widely within each pressure zone. *See* Dolan Decl., Ex. 11 at 192:22-193:9, 194:2-8; Dolan Decl., Ex. 12 at 93:4-7, 114:20-115:2, 140:5-12; Dolan Decl., Ex. 13 at 165:18-21, 166:10-167:12, 169:15-25, 172:16-25.

analysis is even more deficient. In a damning admission, Rosenfeld conceded that:

> "Honestly, what happened was the private wells were sort of sprung on me as an issue. Kind of as an offhand statement saying, 'Please include the private wells.' And I was going, 'Really? Okay. Well, you haven't'--'thank for telling me. What should I do? I don't have a lot of time to deal with this right now. What am I going to do?' So trying to be creative and on the spot, I said, 'You know what? I haven't had a lot of time to figure this one out, ***so I'm just going to suggest that it be the area of investigation' for lack of--for lack of time***. And after I suggested that, I recognized that after the fact, that wells were impacted much farther south than I had anticipated. And at that point, I said that the area can be expanded. I mean, that was just the--the theory. And so I really hadn't put a lot of time into the private wells or thought too much about it."

4/3/18 Rosenfeld Dep. 141:2-141:20. Rosenfeld has not employed *any* scientific methodology to the issue of defining the class of small water systems and private well users. He further admits that defining the class based on the CDPHE Area of Investigation as he tries to do probably is both over-and under-inclusive. Supp. Rep. at 14. The Court cannot certify a class on the basis of such a poor and plainly unreliable definition. *See Wanick v. Dish Network LLC,* 301 F.R.D. 551, 556-57 (D. Colo. 2014) (class must be ascertainable; overbroad class should not be certified).

> 6.   *Rosenfeld's opinion regarding the concentration of PFCs in plaintiffs' blood is based on an unreliable methodology.*

Rosenfeld, who is not a toxicologist, opines that "plaintiffs have profoundly elevated blood serum PFOA and PFOS concentrations." Supp. Rep. at 16; 4/3/18 Rosenfeld Dep. 75:7-11. Because he is not qualified to render such opinions, they should be excluded. This opinion is based on his review of blood serum data from only 20 individuals that were not a representative sample of the proposed class in terms of age, residence location, or residence duration.[5] 4/3/18 Rosenfeld Dep. 54:14-55:17. In addition, this small cohort was selected solely by Plaintiffs'

---

[5] King conceded that blood serum testing on only 20 members of the proposed class was insufficient to draw any conclusions. King Dep. 132–33, 309–10, 337–38.

counsel with no involvement by Rosenfeld (or any expert). *Id.* 45:10-15. The failure to provide an "objective [selection] protocol" or "scrutinize for selection bias" call into serious question the reliability of Rosenfeld's opinion. *Coleman v. Union Carbide Corp.*, 2013 WL 5461855, at *29 (S.D.W. Va. Sept. 30, 2013) ("The rather intense involvement of counsel in the sampling and testing process is not indicative of the disciplined use of the scientific method.").

Despite making such a sweeping conclusory opinion based on no expertise about the blood serum levels of plaintiffs, he admitted in his deposition that "I won't have an opinion as to what the blood data means until the whole entirety of the data is produced. But this is a small slice of preliminary data." 4/3/18 Rosenfeld Dep. 54:25-55:2. Rosenfeld's opinion regarding the PFC blood serum concentrations of certain Plaintiffs should be excluded for this reason as well.

**B.     The Court should exclude Hagemann's unsubstantiated opinions regarding the source of PFCs.**

*1.     Hagemann failed to consider alternative sources of PFCs.*

Hagemann testified that he had no opinion regarding alternative sources of PFCs found near the Airfield. Hagemann Dep. 86:5-10. However, he did not rule out the possibility of potential alternative contributing sources and admits that there "definitely are other potential sources out there than Peterson Air Force Base or the airfield adjacent to it." *Id.* 130:20-25.

For example, a report commissioned by the Air Force and conducted by NewFields Government Services, LLC—which Hagemann relied upon for the Revised Preliminary Report— identified at least "three distinct chemical compositional patterns/fingerprints" within Plaintiffs' proposed class boundaries and concluded that "[t]he observed patterns in composition within these clusters suggest that the source of contamination in the Windmill Gulch may be

13

located at or near the airport area while data observed North and South of Windmill Gulch may have a separate source(s)." Dolan Decl., Ex. 3 ("Hagemann Dep. Ex. 198") at PL_Rosenfeld_049930. While Hagemann acknowledged that the fingerprints were different, he admitted that he has no experience with fingerprinting source analysis, otherwise known as principal component analysis. Hagemann Dep. 127:6-128:4. In similar circumstances, the Southern District of West Virginia excluded a plaintiff's expert who failed to "conduct[] chemical fingerprinting" in response to the defendant's fingerprinting analysis. *Coleman*, 2013 WL 5461855, at *39-40.[6]

By ignoring the impact of contributions of PFCs from alternative sources, Hagemann's opinions about the source of PFCs in groundwater lack any reliable basis and valid connection to the relevant inquiry. *See Taber v. Allied Water Sys., Inc.*, 642 Fed. App'x 801, 810-11 (10th Cir. Feb 25, 2016) (experts must "adequately account[] for obvious alternative explanations"; mere acknowledgement is not sufficient); *Coleman*, 2013 WL 5461855, at *38-39 (excluding expert who characterized defendant's plant as "the classical 800-pound gorilla sitting in your backyard" while dismissing alternate emissions sources as "the 50-pound monkey that is across town").

2.   *Hagemann did not consider any key hydrogeological factors.*

Although Hagemann admits that there are many hydrogeologic features that impact how

---

[6] Hagemann also ignored identified potential alternative sources of PFCs. The NewFields Report identified the Schlage Lock facility near Fountain Creek as a potential source of PFCs. Hagemann Dep. 54:3-9, 108:19-109:1; Hagemann Dep. Ex. 198 at PL_Rosenfeld_049943. Hagemann did not seek out any groundwater data emanating from the Schlage Lock facility. Hagemann Dep. 141:11-14. Hagemann also admitted that wastewater spills at the Las Vegas Wastewater Treatment Plant, which is within the Fountain Valley floodplain, could be a source of PFCs. *Id*. 136:15-137:12. Hagemann did not explore how the relocation of landfill contents in the area may have impacted the leaching of PFCs in to the groundwater. *Id*. 148:6-149:4. Further, Hagemann completely ignored a second report that discussed alternative sources in the area prepared by the State of Colorado, calling the failure to address it an "oversight." *Id*. 69:1-70:6; Dolan Decl., Ex. 9 at 5.

14

PFCs move and are transported in groundwater and impact when and how PFCs could reach specific wells, he did not consider any of these factors. Hagemann explained that well-known MODFLOW modeling "can't even be done because we just started understanding the hydrogeology and we haven't even investigated it to get the data that would allow us to prepare the model." Hagemann Dep. 95:5-9. Ultimately, Hagemann had to admit that the sort of testable predictions found in successful groundwater models are absent from his analysis. Hagemann Dep. 112:12-20. The failure of Hagemann's modeling to consider key factors and generate testable hypotheses should result in the exclusion of his opinions. *See Daubert*, 509 U.S. at 593.

## V.       Conclusion

Because none of the SWAPE experts' opinions satisfy the relevance and reliability requirements of *Daubert,* they must be excluded under Federal Rule of Evidence 702.

Respectfully submitted this 4th day of June, 2018.

*s/ Heather Carson Perkins*
Heather Carson Perkins, Atty. Reg. 30168
FAEGRE BAKER DANIELS
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203
Telephone: 303-607-3500
Facsimile: 303-607-3600
Email: heather.perkins@FaegreBD.com

Daniel L. Ring
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
Telephone: 312-701-8520
Email: dring@mayerbrown.com

*Attorneys for Defendant The 3M Company*

## CERTIFICATE OF SERVICE

I certify that on June 4, 2018, I electronically filed the foregoing with the Court using the CM/ECF system, and served same via the CM/ECF system upon all counsel of record.

*s/ Michelle R. Soule*
Legal Administrative Assistant