IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-02351-RBJ
*Consolidated Cases 16-cv-02394-RBJ and 16-cv-02352-RBJ*

GREGORY BELL,
JOSE ACEVEDO, and
DENISE DURBIN, individually and as parent and next friend of K.D. and B.D.,
for themselves and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE 3M COMPANY f/k/a Minnesota Mining and Manufacturing Co., and
TYCO FIRE PRODUCTS, L.P., successor-in-the interest to The Ansul Company,

      Defendants.

---

## ORDER ON MEDICAL MONITORING MOTIONS

      Defendants Tyco Fire Products, Chemguard and 3M move to dismiss plaintiffs' medical monitoring claims, arguing that Colorado's appellate courts have not recognized such a cause of action. Tyco and Chemguard alternatively request that the issue be certified to the Colorado Supreme Court. Several other defendants ask to join one or both of the motions to dismiss. I decline to certify the issue to the Colorado Supreme Court, hold that Colorado's appellate courts probably would recognize such a claim, but nevertheless grant the motions to dismiss with leave to amend for reasons explained in this order. In this order, although not related to the medical monitoring claim as such, I also grant defendant 3M's motion to dismiss plaintiffs' civil conspiracy claim.

# I. BACKGROUND

Plaintiffs, who reside in the communities of Fountain, Security, or Widefield, Colorado, allege that Aqueous Film Forming Foam (AFFF) used at Peterson Air Force Base as a firefighting suppressant has contaminated the groundwater in their communities for decades. AFFF contains chemicals known as Perfluorinated Compounds ("PFCs"), including perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA") and perfluorheptanoic acid ("PFHpA"), all of which, according to plaintiffs, can cause serious health impacts and affect property values.

## Original Complaints

The original plaintiffs -- Gregory Bell, Jose Acevedo and Denise Durbin – filed two cases September 18, 2016. In case No. 16-cv-2351-RBJ, filed on their own behalf and on behalf of a purported class of similarly situated individuals, they alleged that the contamination of their water has caused property-related damages. In case No. 16-cv-2352-PAB, also filed individually and on behalf of a purported class, plaintiffs sought the costs of medical monitoring which they claimed to be necessary for the early detection of illnesses caused by the contamination. In both cases they named The 3M Company, The Ansul Company and National Foam, manufacturers of AFFF, as defendants. Plaintiffs asserted claims of negligence, defective product/failure to warn, defective product/design defect and unjust enrichment. Plaintiffs' counsel in the first and second cases was Kevin S. Hannon of Denver.

A few days later a third case was filed, *Davis v. The 3M Corp.,* No. 16-cv-02394-RM. This was a class action filed on behalf of a group of nine individuals. Plaintiffs named the same three companies plus Angus Fire, Buckeye Fire Protection Co. and Chemguard as defendants.

They purported to act on behalf of three classes: a "Municipal Water Bodily Injury Class;" a "Private Water Bodily Injury Class;" and a "Property Damage Class." They asserted claims of negligence, private nuisance, medical monitoring, products liability/failure to warn, products liability/defective design, and unjust enrichment. ECF No. 1. Plaintiffs' counsel were Napoli Shkolnik PLLC of New York and the McDivitt Law Firm of Colorado Springs.

All parties to the two *Bell* cases jointly filed a motion to consolidate the three cases for pre-trial proceeds. ECF No. 32. The *Davis* defendants who were also named in the *Bell* cases joined the motion, but the *Davis* defendants who were named only in *Davis* did not. The *Davis* plaintiffs opposed consolidation. The Court granted the motion to consolidate the three cases and directed the parties to file all further pleadings in 16-cv-2351. ECF No. 57.

There was also a dispute among counsel for appointment as "lead interim class counsel" between counsel for the *Bell* plaintiffs (Mr. Hannon) and counsel for the *Davis* plaintiffs (the Napoli Shkolnik and McDivitt law firms). During a Scheduling Conference held on August 24, 2017 the Court appointed none of the competing lawyers or law firms as lead plaintiff's counsel, instead selecting David Hersh of the Burg Simpson law firm of Denver who had, in the interim, appeared as additional counsel for the *Davis* plaintiffs, as lead counsel. *See* ECF No. 83 at 7-8.

## First Amended Complaint

A First Amended Complaint was filed in the consolidated cases on September 22, 2017. ECF No. 88. Because this complaint has been superseded by a Second Amended Complaint, I won't dwell on it other than to note the plaintiffs listed in this version include none of the plaintiffs named in any of the original three complaints.

## Second Amended Complaint

On December 8, 2017, though still under the caption of the original *Bell* case which lists Gregory Bell, Jose Acevedo and Denise Durban as plaintiffs and 3M and Tyco Fire Products (as successor to Ansul) as defendants, plaintiffs filed a Second Amended Complaint in the consolidated class cases. ECF No. 126.[1] This plaintiff group as identified in the body of the Second Amended Complaint is comprised of 16 individuals, none of whom were named as plaintiffs in any of the original three cases, and only some of whom were listed in the First Amended Complaint. These plaintiffs are represented by the Burg Simpson, Napoli Shkolnik and McDivitt law firms but not by Mr. Hannon.

The defendants identified in the body of the Second Amended Complaint are The 3M Company; Tyco Fire Products L.P. (as successor to Ansul), Buckeye Fire Equipment Company, Chemguard, National Foam, Inc., Kidde Fire Fighting, Inc. (individually and as successor to National Foam, Inc.); Kidde PLC, Inc. (individually and as successor to National Foam); Williams Holdings, Inc. (individually and as successor to National Foam); Williams Holdings US, Inc.; Williams Corporation; Kidde-Fenwal, Inc. (individually and as successor to National Foam); UTC Fire & Security Americas Corporation, Inc.; and Enterra Corporation (individually and as successor to National Foam).

---

[1] On February 2, 2018 plaintiffs' moved to amend the caption to list the plaintiffs and the defendants identified in the body of the Second Amended Complaint as the plaintiffs and the defendants in the caption. ECF No. 156. No response was filed, and not realizing at the time that this would create controversy, the Court granted the motion. ECF No. 167. The issues raised in ECF No. 207, the two sets of responses, ECF Nos. 227 and 230, and the two sets of replies, ECF Nos. 236 and 244, demonstrate that even the caption of the consolidated case is in play. I also note that for the most part the parties have continued to use the original caption notwithstanding the Court's order granting the motion to modify the caption. I now vacate the order found at ECF No. 167 and will consider the caption together with the issues raised in ECF No. 207 at the November 30, 2018 hearing, if possible, or thereafter, if necessary.

The Second Amended Complaint is presently the operative complaint in the consolidated cases. Plaintiffs assert class claims on behalf of a Medical Monitoring Class and a Property Damage Class. ECF No. 126 at ¶148. They also assert claims on behalf of themselves individually. Thirteen of the class representatives claim that they suffer from diseases ranging from pregnancy complications to kidney and thyroid disease which they attribute to the exposure to PFCs in their water. *Id.* at ¶¶50-64. These class representatives bring claims on behalf of the class as well as individual personal injury and property damage claims. *Id.* Three class representatives who do not presently suffer from such diseases bring only claims on behalf of the class and individual property damage claims. *Id.* at ¶¶65-67.

The Second Amended Complaint asserts five claims for relief: (1) negligence; (2) medical monitoring; (3) products liability for failure to warn; (4) products liability for defective design; and (5) civil conspiracy. *Id.* at 43–57. Plaintiffs seek to certify sub-classes, and they seek the following relief: a declaration that defendants acted with negligence, gross negligence, or reckless disregard for health, safety, and property; an order requiring defendants to implement a testing and monitoring protocol to test the plaintiffs' water; an order requiring defendants to implement a medical monitoring protocol; and an award of damages, attorneys' fees, costs, and post-judgment interest. *Id.* at 58.

### Individual Actions

To complete the unusual procedural posture of this litigation I note that since the Second Amended Complaint was filed, and for reasons only they know for sure at this point, the Napoli Shkolnik and McDivitt law firms have filed 41 additional cases in this district, all arising from the alleged AFFF contamination of the groundwater in the Fountain, Security and Widefield

communities. Each of these lawsuits is filed on behalf of a large group of individuals. The groups vary in size but average approximately 175 plaintiffs per case for a total of approximately 7,200 individual plaintiffs. Presumably all of these individuals are members of one or more of the purported classes in the consolidated class action cases. So far as the files show, the defendants have not been served.

The existence of the 41 individual plaintiffs' cases has obvious implications for the class action cases and vice-versa. However, other than completing my summary of the procedural history of the "3M cases" I need not otherwise resolve those issues today.

## II. STANDARD OF REVIEW

In three orders issued today I am addressing all pending motions in the three cases consolidated under the *Bell et al. v. The 3M Company* caption other than the motion for class certification which is set for hearing on November 30, 2018. As noted above, the present order primarily addresses defendants' motions to dismiss plaintiffs' claim for funds to implement a program for "medical monitoring" in the affected communities.

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true, *Iqbal*, 556 U.S. at 681.

However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

3M's motion to dismiss plaintiffs' medical monitoring claim on the basis that plaintiffs lack standing to assert this claim is "properly determined pursuant to Rule 12(b)(1) because such argument attacks the Court's subject matter jurisdiction." *Irvine v. I.C. System, Inc.*, 198 F. Supp. 3d 1232, 1235 (D. Colo. 2016). Plaintiffs bear the burden of establishing subject matter jurisdiction. *Id.*

3M also moves to dismiss plaintiffs' civil conspiracy claim, which sounds in fraud, thereby invoking the standard under Fed. R. Civ. P. 9(b). A party pleading fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1153 (D. Colo. 2005) ("To the extent the civil conspiracy claim is based on acts that are unlawful because they constitute fraud, . . . the fraudulent acts must be pled under the standard of Rule 9(b).").

Finally, pursuant to Rule 21.1 of Colorado Rules of Appellate Procedure, the Colorado Supreme Court may "answer a question of state law certified to it by a United States District Court if the question 'may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the [Colorado] Supreme Court.'" *Frias v. Chris the Crazy Trader, Inc.*, No. 13-CV-01240-MSK-KLM, 2014 WL 2975321, at *2 (D. Colo. July 2, 2014), *aff'd* 604 F. App'x 628 (10th Cir. 2015) (quoting Colo. App. R. 21.1.(a)). A district court's decision to certify a question is discretionary, and such a decision may be appropriate "where the legal question at issue is novel

and the applicable state law is unsettled." *Id.* (citations omitted). "However, certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law. [. . . ]Absent some recognized public policy or defined principle guiding the exercise of jurisdiction conferred, federal courts bear a duty to decide questions of state law when necessary to render a judgment." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1235 (10th Cir. 2012) (internal quotation marks and citation omitted).

### III. ANALYSIS

Plaintiffs assert a claim for medical monitoring under Colorado law on the grounds that they were exposed to PFCs due to defendants' actions. Plaintiffs contend that they are therefore at a higher risk of contracting a serious latent disease for which periodic medical testing is reasonably necessary, and that such testing exists, making the early detection of those diseases possible and beneficial. ECF No. 126 at 49. Plaintiffs assert, for example, that because of their exposure to PFCs, they are at an increased risk of developing "effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer." *Id.* at 18. However, defendants dispute the validity of such a claim under Colorado law, asserting that Colorado courts do not recognize claims for medical monitoring absent a present physical injury. ECF No. 154 at 1; ECF No. 157 at 5.

Each of the three substantive motions before the Court turns at least in part on this question. In Tyco and Chemguard's motion to dismiss plaintiffs' medical monitoring claim, which is joined by National Foam, Kidde PLC, Kidde-Fenwal, UTC Fire, and Buckeye (collectively, "Tyco and Chemguard"), defendants contend that Colorado courts have never recognized such a claim. ECF No. 154 at 1; *see also* ECF Nos. 160, 219, 159. Similarly, in

3M's motion to dismiss plaintiffs' medical monitoring and conspiracy claims, which is joined by Buckeye, 3M asserts that Colorado courts do not recognize claims for medical monitoring where there is no physical injury. ECF No. 157; *see also* ECF No. 159. Finally, Tyco and Chemguard ask this Court to certify this question to the Colorado Supreme Court in the event that their motion to dismiss is denied. ECF No. 155.

Given that each of these motions turns on this central question of the status of medical monitoring claims in Colorado, I will address it first. I will then turn to the additional contentions defendants raise in their motions with respect to the medical monitoring claim, namely that plaintiffs lack standing to bring this claim and have failed to adequately plead all the elements of the claim. I will separately address 3M's contention that plaintiffs have failed to properly plead their claim of civil conspiracy.

### A. <u>Plaintiffs' Medical Monitoring Claim</u>.

As defendants and plaintiffs acknowledge, the Colorado Supreme Court has not yet addressed the question at issue. Indeed, plaintiffs concede that "the Colorado Supreme Court has yet to explicitly address medical monitoring as a cause of action," and that there is "limited Colorado Supreme Court precedent" on the subject. ECF No. 182 at 3, 6. Instead, plaintiffs rely on a 1991 opinion from Judge Babcock in this district finding that "the Colorado Supreme Court would probably recognize, in an appropriate case, a tort claim for medical monitoring." ECF No. 182 at 3–5 (quoting *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1471 (D. Colo. 1991)). Defendants, in contrast, note that despite Judge Babcock's prediction, the Colorado Supreme Court has not recognized such a claim in the intervening 27 years, and they contend that the trend nationally has been "to reject claims for medical monitoring." ECF No. 199 at 2.

In cases arising under diversity jurisdiction, like this one (*see* ECF No. 126 at 11),

the Court's task is not to reach its own judgment regarding the substance of the common law, but simply to "ascertain and apply the state law." Where no controlling state law exists, the federal court must endeavor to predict what the state's highest court would do if it were faced with the same facts and issues. In making that prediction, a court considers "analogous decisions by the [state] Supreme Court, the decisions of the lower courts in [the state], the decisions of the federal courts and of other state courts."

*Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 78 F. Supp. 3d 1307, 1312 (D. Colo. 2014)

(internal citations omitted, alterations in original).

Thus, to decide how the Colorado Supreme Court might decide this question, I will assess

Judge Babcock's reasoning in *Cook* and examine the developments in other courts throughout

the country and in Colorado. As a threshold matter, however, I first address one apparent

inconsistency in plaintiffs' complaint related to the nature of their injury. Although, as noted

above, 13 class representatives have diseases which they attribute at least in part to their

exposure to PFCs, the medical monitoring claim is not based on any present physical injury.

Instead, plaintiffs with and without current health issues assert the medical monitoring claim

only for potential *latent* maladies. ECF No. 126 at 50 (plaintiffs note that they "are at a seriously

increased risk of contracting numerous medical conditions," and they contend that medical

examinations are necessary "to detect latent diseases"). Indeed, as will be discussed herein, the

central question in most medical monitoring cases is whether plaintiffs without current physical

injuries can assert claims for monitoring.

However, there is also a small subset of cases from other jurisdictions in which

"subclinical" changes, such as the bioaccumulation of toxins in blood or the breakdown of DNA,

have been found to constitute present physical injury despite the absence of any clinical

manifestation of the injury.  *See Baker v. St.-Gobain Performance Plastics Corp.*, 232 F. Supp.

3d 233, 251 (N.D.N.Y. 2017) *appeal docketed*, No. 17-2494 (2d Cir. May 15, 2018) (finding that

the accumulation of PFOA in the blood was enough to constitute an injury within a preexisting

tort); *see also Donovan v. Philip Morris USA, Inc.*, 914 N.E. 2d 891, 902 (Mass. 2009)

(concluding that the cost of medical monitoring is compensable where there is a substantial

increase in the risk of harm due to exposure "and so long as there has been at least a

corresponding subcellular change").  Perhaps in an attempt to fit into this set of cases, or perhaps

in an attempt to establish their standing, plaintiffs also assert in their complaint that they "have

suffered an injury due to the bioaccumulation of these hazardous substances in their blood."

ECF No. 126 at 50.  Doubling down on this argument in their responses to defendants' motions

to dismiss, plaintiffs assert that they "have pled a direct physical injury, the bioaccumulation of

PFOA and PFOS in their blood."[2]  ECF No. 182 at 7, ECF No. 184 at 7.

   To the extent that plaintiffs attempt to assert that the bioaccumulation of toxins or

subclinical damage constitute a present physical injury, I am not convinced.  Plaintiffs have

provided no indication that the Colorado courts recognize such a theory.  Moreover, the Tenth

Circuit has provided a persuasive guide as to how the Colorado Supreme Court might perceive

this issue in *June v. Union Carbide Corp.*, 577 F.3d 1234, 1249 (10th Cir. 2009) (noting that "a

number of courts have recognized medical-monitoring claims . . . premised on subclinical effects

of toxic exposure," but concluding that even in those cases such subclinical changes do not

constitute "*bodily* or *physical* injuries") (emphasis in original).  Because I agree with the Tenth

---

[2] In arguing that they have standing to raise this claim, plaintiffs assert yet another theory of their injury:
"[t]he injury in a claim for medical monitoring is the cost of the medical care that will, one hopes, detect
that injury."  ECF No. 184 at 8.

Circuit that the "subclinical" injury theory is not likely to suffice to establish a present physical injury, I will evaluate plaintiffs' claim with the understanding that they do not suffer from any present physical injury <u>for which they are seeking monitoring</u>. Thus, the question at issue is whether a plaintiff without a present physical injury may assert a claim for medical monitoring based only on the exposure to PFCs and the risk of latent diseases.

1. <u>Judge Babcock's Prediction in *Cook*</u>.

As noted above, this question was last addressed in this district in a 1991 decision by Judge Babcock in *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1471 (D. Colo. 1991). The *Cook* plaintiffs lived near a nuclear waste site and sued for injury and damages caused by the release of hazardous substances from the site. *Id.* at 1477. They sought the costs of individualized medical monitoring under both the Price Anderson Act, which provides a remedy for physical injuries resulting from nuclear substances, and under Colorado common law. *Id.* at 1471. Because Judge Babcock concluded that the Colorado Supreme Court would probably recognize a claim for medical monitoring, he found that the plaintiffs' claim for individualized medical monitoring was cognizable. *Id.* at 1477. Despite the fact that plaintiffs' claim was deemed cognizable, Judge Babcock found that they had failed to adequately plead exposure to a hazardous substance. *Id.* As such, they were granted leave to amend their complaint. *Id.*

In concluding that the Colorado Supreme Court would likely recognize a medical monitoring claim, Judge Babcock summarized the "unique issues" implicated in cases alleging exposure to toxic substances under traditional common law tort theory, including that injuries resulting from such exposure are often latent. *Id.* at 1476. Such latency "presents seemingly insurmountable problems of proof" with respect to proving the physical injury element traditionally required to impose tort liability. *Id.* As a result, Judge Babcock turned to "non-traditional" tort claims in which plaintiffs are afforded relief even though they have "not yet manifested present physical injury." *Id.* These non-traditional claims included emotional

distress claims based on the fear of contracting a toxic exposure disease and medical monitoring claims. *Id.*

Judge Babcock noted the difference between a claim for medical monitoring and a claim for enhanced risk of future disease: the latter seeks "compensation for the anticipated harm itself," whereas medical monitoring claims seek to recover "only the quantifiable costs of periodic medical examinations" needed to detect the onset of a disease. *Id.* (internal quotation marks and citation omitted). Judge Babcock also outlined the "simple" theory behind a claim for medical monitoring, which he explained as being motivated by the "sound medical practice" of seeking medical monitoring to determine whether a plaintiff who has been exposed to a hazardous substance has contracted a disease from that exposure. *Id.* at 1477. Judge Babcock explained that where a defendant's tortious acts created the need for the monitoring, the defendant should be required to pay the cost. *Id.* He distinguished medical monitoring—which "compensates a plaintiff for diagnostic treatment, a tangible and quantifiable item of damage caused by a defendant's tortious conduct"—from generalized scientific studies to determine the odds a particular person might contract a disease. *Id.* at 1478.

Judge Babcock was persuaded by precedent in other circuits, observing that "[c]ourts have generally accepted tort claims for medical monitoring." *Id.* For example, he cited *In re: Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990), in which "the Third Circuit followed the weight of authority" when it predicted that the Pennsylvania Supreme Court would allow such a cause of action. *Id.*

2. Developments in Colorado Courts Since *Cook*.

Defendants contend that Judge Babcock's prediction defied existing Colorado law in 1991 and has not been borne out by Colorado courts in the intervening 27 years. According to Tyco and Chemguard, Colorado courts require "actual physical injury as a prerequisite to claiming damages in tort." ECF No. 154 at 2–3. 3M, for its part, takes issue with the fact that "*Cook* reached its conclusion not by analyzing Colorado law . . . but in reliance upon four medical-monitoring cases from other jurisdictions." ECF No. 157 at 8. Defendants rely on several arguably analogous cases involving "fear of cancer" or emotional distress claims to explain Colorado courts' physical injury requirement. *See* ECF No. 154 at 2–3 (citing *Towns v. Anderson*, 579 P.2d 1163, 1164 (Colo. 1978) and *Boryla v. Pash*, 960 P.2d 123 127–28 (Colo. 1998)).[3]

In *Towns*, which preceded *Cook* by more than a decade, the Colorado Supreme Court assessed the question whether a plaintiff may assert a claim for emotional distress despite the fact that he did not sustain any physical injury at the scene of the accident that caused his distress.[4] 579 P.2d at 1164. The Court found that if the plaintiff does in fact develop serious physical manifestations as a result of his emotional distress, including, for example, nightmares, sleepwalking, nervousness and irritability, damages resulting from a claim for emotional distress can follow. *Id.* at 1164–65.

---

[3] Defendants also cite *Gibbons v. Ludlow*, 304 P.3d 239, 246 (Colo. 2013) for the principle that "a cause of action does not lie when the fact of damages is uncertain or speculative." ECF No. 154 at 3. However, this case occurs in the context of "claiming lost profits as damages in a professional negligence case," and as such is inapposite here. 304 P.3d at 246.

[4] The fact that *Towns* predated Judge Babcock's decision but did not factor into his reasoning indicates that the issues presented were not instructive in the context of a medical monitoring claim.

In *Boryla*, the plaintiff brought claims for emotional distress, including fear of the increased risk of a recurrence of cancer, after a doctor failed to promptly diagnose her cancer in the first instance.  960 P.2d at 127.  The Colorado Supreme Court emphasized that the plaintiff "did not request damages for the increased possibility that she might suffer a recurrence of cancer," but that she instead "sought damages for 'emotional distress, including *fear* of an increased risk of recurrence of cancer.'"  *Id.* (emphasis in original).  The court held that a plaintiff must prove actual physical injury as a prerequisite to claiming damages in tort for emotional distress based on the risk of recurrence of future harm.  *Id.*  Because the plaintiff in that case had experienced the growth of a tumor based on her doctor's failure to promptly diagnose her cancer in the first instance, the court was satisfied that she had provided evidence of an "attendant physical injury" such that the jury could consider her request for damages tied to emotional distress.  *Id.*  The court limited its conclusion to fear of cancer cases in the medical malpractice setting, in which there is usually an existing malady, as distinct from the toxic tort setting, in which the patient has yet to experience the onset of the malady.  *Id.* at 128.

Neither of these cases precludes a medical monitoring claim in the absence of a present physical injury.  Emotional distress claims are distinct from medical monitoring claims.  As Judge Babcock pointed out, medical monitoring claims seek to recover the "'quantifiable costs of periodic medical examinations.'"  *Cook* at 1476, quoting *Paoli Railroad* at 850.  Such claims require evidence of a plaintiff's exposure, the nature of the risk they face, and the nature of the monitoring procedures available.  *See id.* at 1477 (outlining the elements a plaintiff must prove in a claim for medical monitoring damages).  Thus, the fact that courts require evidence of a

physical injury in an emotional distress claim does not indicate that such a requirement is necessary in the context of medical monitoring.

This distinction is borne out in other jurisdictions. In *Burns v. Jaquays Min. Corp.*, 752 P.2d 23, 31 (Ariz. Ct. App. 1987), for example, where the plaintiffs asserted claims for emotional distress for fear of developing diseases, the court held that "[t]here can be no claim for damages for the fear of contracting asbestos-related diseases in the future without the manifestation of a bodily injury." Nevertheless, the court noted that "despite the absence of any physical manifestation of any asbestos-related diseases" the plaintiffs should be entitled to regular medical testing and evaluation. *Id.* at 33. *See also Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 60, 80 (Ct. App. Md. 2013) (concluding that to recover emotional distress damages for fear of contracting a disease a plaintiff must show that "he or she manifested a physical injury capable of objective determination," but nonetheless recognizing a claim for medical monitoring absent evidence of physical injury). Thus, the fact that Colorado requires evidence of physical injury in emotional distress claims for fear of future diseases does not indicate that the state would require such evidence in medical monitoring case.

Aside from *Boryla*, neither side points to any Colorado case since *Cook* that might elucidate the Colorado Supreme Court's treatment of the medical monitoring claim at issue here. Regardless of the reason that the state courts have not addressed the issue, the absence of an affirmation of Judge Babcock's prediction does not amount to an overturning of that prediction. The key fact is that no Colorado state court has given any indication in the intervening years that Judge Babcock's prediction was incorrect. As such, Colorado state court decisions do not provide any basis to diverge from Judge Babcock's finding in *Cook*.

### 3. <u>Developments in Federal Courts Interpreting Colorado Law Since *Cook*</u>.

Perhaps recognizing that Colorado courts have shed little light on this question since *Cook*, defendants also point to decisions from the Tenth Circuit and the federal district courts therein which they argue show that physical injury is required to sustain a medical monitoring claim. However, none of these cases answers the question at issue here.

First, in *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1202 (10th Cir. 2000), residents near a uranium mill sued for emotional distress based on the fear of developing cancer due to their exposure to hazardous substances. Though the plaintiffs asserted certain physical conditions allegedly caused by their exposure, the Tenth Circuit affirmed the district court's finding that plaintiffs had not offered evidence of "an objectively reasonable chronic, continuing physical manifestation to support their fear of an increased risk of cancer." *Id.* at 1201. The Tenth Circuit distinguished the toxic tort case before it from *Boryla*, a medical malpractice case. *Id.* at 1202. It disagreed with the plaintiffs' attempt to "equat[e] the manifestation of certain acute conditions," as in *Dodge*, with a permanent objective injury leading to an increased risk of cancer," as in *Boryla*. *Id.* The Tenth Circuit observed that there was no indication that the Colorado Supreme Court would permit such an expansion of the *Boryla* analysis to the toxic tort realm. *Id.* However, the court also noted that the plaintiffs attempted to "sweep every physical manifestation plaintiffs alleged under this mantle" despite the absence of "any evidence that they suffer from a chronic objective condition." *Id.*

The *Dodge* court's refusal to find that present acute physical conditions justified a "fear of cancer" emotional distress claim in a toxic tort case is inapposite to the question at issue here. As noted above, emotional distress claims are inherently less quantifiable than medical

monitoring claims, and thus should require plaintiffs to prove some objective physical manifestation before they may recover for their distress. Without courts demanding such evidence, they risk a landslide of emotional distress complaints based on fear of future conditions that are unmoored from any substantial likelihood of harm. Cases for medical monitoring, however, involve requirements that the parties seeking monitoring demonstrate the elevated risk of harm before funds for monitoring will be established. *See Cook*, 755 F. Supp. at 1477 (outlining the elements plaintiffs must establish before obtaining medical monitoring damages). Medical monitoring cases also involve quantifiable costs: the known cost of known tests for diseases to which a plaintiff is more likely predisposed based on a proven exposure. As such, the *Dodge* court's demand for more evidence of present physical injury in an emotional distress claim does not indicate that the court would demand such evidence in this type of case.

Moreover, I note that separate from the emotional distress claims, the *Dodge* plaintiffs had also raised claims of negligence involving medical monitoring as a remedy. *Id.* at 1194–95. The validity of medical monitoring as a remedy was not raised to the Tenth Circuit because a jury had found there was not exposure "to hazardous substances making reasonably necessary future medical monitoring or testing." *Id.* at 1195. Nonetheless, the fact that this claim involving medical monitoring was considered entirely separately from the emotional distress claim for future harm further bolsters the distinction between these two claims despite any apparent superficial similarities.

Defendants also cite the Tenth Circuit's decision in *June v. Union Carbide Corp.*, 577 F.3d 1234, 1249 (10th Cir. 2009) for the proposition that "where physical injury is required, asymptomatic plaintiffs cannot satisfy this element by exposure alone." ECF No. 154 at 4.

However, *June* involved a claim for medical monitoring brought pursuant to the Price-Anderson Act, which explicitly requires a "bodily injury" before a court may exercise jurisdiction over a claim for medical monitoring. 577 F.3d at 1248. The statutory requirement of a bodily injury in *June* merely begs the question whether there is such a requirement for a bodily or physical injury in the present context absent such a statutory framework. As a result, *June* is inapposite in the present context.

Contrary to defendants' contention that developments in the Tenth Circuit doom plaintiffs' claims, plaintiffs assert that developments in this Circuit since *Cook* demonstrate acceptance of medical monitoring claims absent physical injury. Plaintiffs survey several federal court decisions since *Cook* which they say demonstrate that the federal courts in this Circuit "have not raised concerns about the predicate issue of whether medical monitoring claims are viable in Colorado." ECF No. 182 at 6. In *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1218–20 (10th Cir. 2003), as plaintiffs note, the Tenth Circuit did indeed "trac[e] the procedural history of medical monitoring jury verdicts without questioning the viability of medical monitoring as a cause of action." *Id.* This *Dodge* decision from 2003 analyzed many of the same trial court decisions as the 2000 *Dodge* case. Similar to that earlier case, the validity of medical monitoring claims was not before the Tenth Circuit in the 2003 case, though it is true that, as plaintiffs point out, the court noted jury verdicts involving medical monitoring claims as a remedy. Similarly in *Building & Const. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1490 n.2 (10th Cir. 1993), the Tenth Circuit noted that "[t]he parties to this litigation do not dispute the existence of medical monitoring claims under state law," and that "the concept of medical monitoring is gaining wide acceptance." (citing cases).

Another court in this Circuit—the federal district court for the Northern District of Oklahoma—summarized Tenth Circuit precedent as "cast[ing] doubt on the permissibility [of] the medical monitoring remedy sought in this case." *Cole v. ASARCO, Inc.*, 256 F.R.D. 690, 695 (N.D. Okla. 2009). The *Cole* court considered *Building*, which *Cole* described as affirming the district court's finding that "plaintiffs' claims for medical monitoring were barred by the exclusivity provisions of the Colorado Workmen's Compensation Act." *Id.* However, the fact that a particular statute barred a claim for medical monitoring does not indicate the invalidity of the claim itself absent the statute. The *Cole* court also cited two Tenth Circuit cases affirming decisions to deny class certification for medical monitoring classes on the basis that the relief sought in such cases was "essentially for damages." *See id.* (citing *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 480 (D. Colo. 1998) and *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995)). However, the fact that the remedy pursued in such claims makes them inappropriate for class certification does not invalidate the claims at the motion to dismiss phase. As such, despite *Cole*'s characterization, I am not convinced that the Tenth Circuit has fundamentally questioned claims for medical monitoring without present physical injury

Thus, while the Tenth Circuit has not expressly assessed the validity of claims for medical monitoring or the use of medical monitoring as a remedy, its decisions since *Cook* do not evince a clear disposition against these claims. To the contrary, if anything, these decisions indicate a tacit approval from the Tenth Circuit for such claims.

### 4. United States Supreme Court Developments Since *Cook*.

Defendants contend that even if Judge Babcock's decision in *Cook* accurately conveyed the national trend with respect to medical monitoring claims in 1991, that trend has shifted in the

intervening years.  As a threshold matter, both parties recognize the importance of the United

States Supreme Court's decision in *Metro-North Commuter Railroad Company v. Buckley*, 521

U.S. 424 (1997), the most recent Supreme Court decision addressing medical monitoring claims.

Defendants contend that *Buckley* represents a sea change from the trend observed in *Cook*

in favor of medical monitoring claims.  According to defendants, the national trend has been "to

reject claims for medical monitoring for the reasons set out by the U.S. Supreme Court in

[*Buckley*]."  ECF No. 199 at 2.  In *Buckley*, the Court assessed an individual's claims for

damages under the Federal Employers' Liability Act ("FELA") for negligently inflicted

emotional distress and to cover the cost of medical monitoring resulting from his exposure to

asbestos in his workplace.  The Court concluded that the emotional distress at issue did not itself

constitute an "injury" as required under FELA and thus was not compensable absent any

physical manifestations.  *Buckley*, 521 U.S. at 437–38.  Additionally, the Court overturned the

Second Circuit's award for damages for medical monitoring based on the plaintiff's exposure to

asbestos.  *Id.* at 439.  However, I do not agree with the defendants' broad contention that the

*Buckley* Court held that the plaintiff seeking to recover the cost of extra medical checkups "could

not recover until he manifested symptoms."  ECF No. 154 at 6.  The Court's holding was in fact

narrower and more nuanced.

First, the Court found that the Second Circuit erred to the extent that its award of

damages for medical monitoring was based on emotional distress as the predicate injury.  *Id.* at

439.  Second, the Court noted that to the extent the appellate court's decision was based on the

medical monitoring costs themselves "represent[ing] a separate negligently caused economic

'injury'" for which plaintiffs were entitled to "the recovery of medical cost damages in the form

of a lump sum," the court had gone "beyond the bounds of currently 'evolving common law.'" *Id.* at 439–40 (citation omitted). Thus, the Court concluded that the FELA did not contain an "*unqualified*" tort liability rule for lump sum damages in medical monitoring cases. *Id.* at 444 (emphasis in original).

In so holding, the *Buckley* Court "canvassed the state-law cases" on the subject to conclude that the Second Circuit had gone farther than any other court at that time when it endorsed "a full-blown, traditional tort law cause of action for lump-sum damages" for an asymptomatic plaintiff seeking medical costs. *Id.* The Court did not disagree with the state courts that "recognize[e] that medical monitoring costs can amount to a harm that justifies a tort remedy," but instead it noted that these courts have "suggested, or imposed, special limitations on that remedy," including insurance mechanisms or court-supervised funds to administer medical surveillance funds. *Id.* at 440–41. Thus, the Court was concerned with the "traditional lump-sum damages remedy" rather than with claims for medical monitoring as such. *Id.* at 441.

The Court noted policy concerns with lump sum rewards for medical monitoring claims, including that identifying the extra monitoring costs "over and above those otherwise recommended" will sometimes pose special difficulties for judges and juries, and that traditional tort liabilities "would ignore the presence of existing alternative sources of payment, thereby leaving a court uncertain about how much of the potentially large recoveries would pay for otherwise unavailable medical testing and how much would accrue to plaintiffs for whom employers or other sources . . . might provide monitoring in any event." *Id.* at 441–43. The Court also observed that the number of individuals exposed to substances, "along with uncertainty as to the amount of liability, could threaten both a 'flood' of less important cases . . .

and the system harms that can accompany 'unlimited and unpredictable liability.'" *Id.* at 442. After emphasizing that "the limitations and cautions [are] important—and integral—parts of the state-court decisions that permit asymptomatic plaintiffs a separate tort claim for medical monitoring costs," the Court concluded that there was insufficient support for "the unqualified rule of lump-sum damages recovery that is, at least arguably, before us here." *Id.* at 444. The Court noted that its conclusion was "limited." *Id.* The plain language of the Court's decision indicates that it was not outright denying or precluding recovery for medical monitoring for asymptomatic plaintiffs, as defendants contend, but that it was merely finding that the "full-blown, traditional" remedy at issue in that case was not appropriate.

As a result, I do not agree with defendants that the Supreme Court so clearly reversed the trend observed by the *Cook* court in 1991 of "generally accept[ing] tort claims for medical monitoring." 755 F. Supp. at 1477. Instead, I find that the Court indicated that it might approve of such claims, albeit not in such a broad and sweeping form as the Second Circuit attempted to provide.

This characterization of *Buckley* was affirmed in *Koch v. Hicks (In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.)*, No. 1:00-1898, MDL 1358 (SAS), 2006 WL 1816308, at *2–*3 (S.D.N.Y. June 26, 2006). In rejecting a challenge to its earlier finding that Maryland courts would likely permit a claim for medical monitoring, the *Koch* court summarized the *Buckley* holding as providing "that a lump sum award of damages for medical monitoring to an asymptomatic plaintiff was not provided for by the [FELA]." *Id.* at *3. The court dismissed the assertion that *Buckley* "'marks a turning point' in the recognition of medical monitoring claims." *Id.* Instead, the court noted that the *Buckley* Court had been concerned only about the flood of

litigation resulting in awards for *lump sum* damages, and that the *Buckley* Court had noted "that many of the courts authorizing the recovery of costs for medical monitoring have imposed limitations on the remedy that address these policy concerns." *Id.* at *14. Thus, the *Koch* court concluded that *Buckley* "did not create a sea change in the law of medical monitoring claims, which continue to be recognized around the country." *Id.* at *14–*15. As a result, I am satisfied that *Buckley* does not indicate that lower courts should deny medical monitoring claims absent present physical injury.

### 5. Developments in Other Jurisdictions Since *Cook*.

In addition to citing Colorado state court decisions, federal court decisions interpreting Colorado law, and United States Supreme Court jurisprudence, the parties also both rely on the decisions of other state courts—as well as the predictions of other federal courts interpreting other states' laws—to illustrate what they each perceive as a national trend in their respective favors. While there are persuasive arguments articulated by a number of state and federal courts on both sides of the debate, neither plaintiffs nor defendants are able to demonstrate an overwhelming surge of decisions that would indicate that there is a strong national trend one way or the other. Thus, the weight of other state and federal court decisions does not sway my decision one way or another. Nevertheless, I will briefly outline the various state court decisions cited by both sides to the extent these decisions shed light on the existence and direction of any national trend.

Defendants cite various state decisions, along with federal decisions predicting state law, in which courts find that medical monitoring does not constitute a valid cause of action absent a present physical injury. *See, e.g.*, *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 666 (W.D.

Tex. 2006); *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 5 (Miss. 2007); *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 18 (N.Y. 2013); *Cole v. ASARCO, Inc.*, 256 F.R.D. 690, 695 (N.D. Okla. 2009); *Lowe v. Philip Morris USA, Inc.*, 183 P.3d 181, 187 (Or. 2008); *Schwan v. Cargill Inc.*, 2007 WL 4570421, at *2 (D. Neb. Dec. 21, 2007); *Curl v. Am. Multimedia, Inc.*, 654 S.E.2d 76, 81 (N.C. App. 2007); *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1302 (N.D. Ga. 2005); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 686 (Mich. 2005); *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 856 (Ky. 2002); *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 829 (Ala. 2001); *Jones v. Brush Wellman, Inc.*, No. 1:00 CV 07772000 WL 33727733, at *8 (N.D. Ohio Sept. 13, 2000); *Bowerman v. United Illuminating*, X04CV 940115436S, 1998 WL 910271, at *1 (Conn. Super. Dec. 15, 1998). As defendants note, many of these cases cite the policy concerns highlighted in *Buckley* regarding the feasibility and implications of recognizing claims for medical monitoring.

Nevertheless, plaintiffs also cite a number of cases from state and federal courts reaching the opposite conclusion and recognizing medical monitoring as either an independent cause of action or as a remedy. *See, e.g., Burns v. Jaquays Mining Corp.*, 752 P.2d 28, 33 (Ariz. Ct. App. 1987); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 821-825 (Cal. 1993); *Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 106-107 (Fla. Dist. Ct of App., Third District, 1999); *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 76-77, *modified*, 71 A.3d 150 (Md. Ct. App. 2013); *Donovan v. Philip Morris USA, Inc.*, 914 N.E. 2d 891, 902 (Mass. 2009); *Meyer ex. rel. Coplin v. Fluor Corp.*, 220 S.W. 3d 712, 717-718 (Mo. 2007); *Sadler v. PacifiCare of Nev., Inc.*, 340 P.3d 1264, 1272-73 (Nev. 2014); *Ayers v. Twp. of Jackson,* 525 A.2d 287 (N.J. 1987); *Redlands Soccer Club v. Dept. of the Army*, 696 A.2d 137, 145-46 (Pa. 1997); *Hansen v. Mountain Fuel*

*Supply Co.*, 858 P.2d 970, 978 (Utah 1993); *Bower v. Westinghouse Elec. Corp.*, 522 S.E. 2d 424, 431 (W. Va. 1999); *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 824–25 (D.C. Cir. 1984); *Allgood v. Gen. Motors Corp.*, No. 02-CV-1077-DFH-TAB, 2005 WL 2218371, at *1 (S.D. Ind. Sept. 12, 2005); *Leib v. Rex Energy Operating Corp.*, No. 06-CV-802-JPG-CJP, 2008 WL 5377792, at *12–13 (S.D. Ill. Dec. 19, 2008); *Elmer v. S.H. Bell Co.*, 127 F. Supp. 3d 812, 825 (N.D. Ohio 2015).

Thus, as these competing lists indicate, and as several of the cases cited herein acknowledge, the question of the validity of medical monitoring claims absent a present physical injury is one that "has divided state and federal courts in recent decades." *Allgood*, 2005 WL 2218371, at *1. It would be disingenuous for this Court to attempt to divine some sort of overwhelming trend resulting from these mixed decisions. Instead, I will note only that while there are compelling arguments on either side of the debate, the national trend either way is not so clear as to indicate that Colorado would not follow Judge Babcock's prediction even 27 years later.

6. Conclusion Regarding Medical Monitoring Claim.

Defendants' argument boils down to the fact that plaintiffs have not "provide[d] any basis for this Court to predict that the Colorado Supreme Court would agree with one of the courts they cite rather than" with the *Buckley* decision or any of the state courts that rejected claims for medical monitoring. ECF No. 199 at 3. However, as indicated above, *Buckley* does not support defendants' contention as clearly as they argue; the Colorado cases they have cited are distinguishable; the Tenth Circuit and District of Colorado precedent is on balance modestly in plaintiffs' favor; and other state courts are generally divided on the question. As such,

defendants have not provided any basis on which to conclude that Judge Babcock's prediction is invalid. I will not find his prediction incorrect merely because it remains untested in this state. Moreover, I note that the same policy consideration that swayed Judge Babcock in favor of acknowledging medical monitoring claims in 1991 remain persuasive today. Thus, I conclude that though it is a close call, plaintiffs have the stronger argument. As such, I reaffirm Judge Babcock's prediction that in an appropriate case, the Colorado Supreme Court would probably recognize a claim for medical monitoring absent present physical injury.

**B. Standing to Bring Medical Monitoring Claim.**

In addition to disputing the existence of a medical monitoring claim under Colorado law, 3M also alleges that plaintiffs lack standing to assert a medical monitoring claim should one exist. ECF No. 157 at 10. "The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). To establish Article III standing, a plaintiff must meet three elements: (1) plaintiff must have suffered an "injury in fact," defined as an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely rather than speculative that the injury will be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

According to 3M, plaintiffs "seek to recover for hypothetical and speculative injuries" rather than for "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" invasions of legally protected interests. ECF No. 157 at 10 (quoting *Lujan*, 504

U.S. at 560). This argument appears to be essentially a rehashing of the substantive argument against plaintiffs' claim for medical monitoring, as evident when 3M notes that "[t]he lack of a concrete injury is precisely what makes many courts so skeptical of medical monitoring claims." *Id.* Despite 3M's dispute with the nature of the injury in this case, I am satisfied that plaintiffs have pled an injury-in-fact in the form of the cost of medical monitoring they assert.

As an initial matter, the "injury" required for standing is distinct from the "present physical injury" discussed above in the context of the medical monitoring claim. Plaintiffs provide multiple explanations of their injury in this case. In their complaint they assert that the injury they have suffered under this claim is the "increased risk of injury" due to exposure to PFCs. ECF No. 126 at 10; *see also* ECF No. 184 at 8 (citing *Rhodes v. E.I. Du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 759 (S.D. W. Va. 2009) ("[T]he weight of authority suggests that an increased risk of injury constitutes an injury-in-fact under Article III."). However, in defending their standing in their response to 3M's motion, plaintiffs assert that "[t]he injury in a claim for medical monitoring is the cost of the medical care that will, one hopes, detect that injury." ECF No. 184 at 8 (citing *Redland Soccer Club v. Dep't of the Army*, 696 A.2d 137, 144 (Pa. 1996)). Despite plaintiffs' inconsistency in articulating the nature of their injury, both theories are valid. I am satisfied that at the very least, plaintiffs' asserted injury of the cost of the medical care they seek is a valid and quantifiable injury that confers standing to assert this claim.

Other courts have concurred with the latter characterization of the injury in medical monitoring cases. *See, e.g.*, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C. Cir. 1984) ("[A]n individual has an interest in avoiding expensive diagnostic examinations," and "[w]hen a defendant negligently invades this interest, the injury to which is

neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations."). Additionally, as Judge Babcock noted, the cost of medical monitoring is tangible and quantifiable. *Cook*, 755 F. Supp. at 1478. Such a quantifiable cost is concrete and particularized, rather than being hypothetical and speculative.

Because plaintiffs' asserted injury of the cost of medical care is real, concrete and redressable by a medical monitoring fund established by the Court, this injury suffices to establish plaintiffs' standing. Though plaintiffs might have pled their injury more consistently, their failure to do so does not undermine their standing to assert their medical monitoring claim.

### C. <u>Adequately Pleading the Elements of the Medical Monitoring Claim</u>.

Having reaffirmed Judge Babcock's prediction in *Cook* that the Colorado Supreme Court would likely recognize a medical monitoring claim even in the absence of a present physical injury, and that plaintiffs have standing to assert this claim, I must next reach defendants' argument that plaintiffs have failed to adequately plead the required elements of such a claim.

As articulated by Judge Babcock in *Cook*, a claim for medical monitoring requires a plaintiff to establish that (1) the plaintiff has suffered a significant exposure to a hazardous substance through the tortious actions of the defendant; (2) as a proximate result of this exposure, the plaintiff suffers from an increased risk of contracting a serious latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial. *Cook*, 755 F. Supp. at 1477. Tyco and Chemguard contend that plaintiffs have failed to adequately plead any of these elements. ECF No. 154 at 11–13. I disagree with defendants as to the first two elements, but agree as to the last two.

Tyco and Chemguard argue that plaintiffs have failed to plead that they were significantly exposed to the substances at issue, or that such exposure significantly increased their risk of contracting a serious disease. *Id.* at 11. Defendants complain that plaintiffs have offered no basis to measure their exposure rates or what makes their exposure significant. *Id.* Defendants dispute plaintiffs' reliance on the Environmental Protection Agency's ("EPA") publication of regulatory standards for PFOA and PFOS to demonstrate that their exposure in this case is significant, contending that the use of such standards is "insufficient to establish increased risk." *Id.* (citing *Sutera v. Perrier Grp. of Am.*, 986 F. Supp. 655, 664–67 (D. Mass. 1997)). However, defendants' reliance on *Sutera* for this point is inappropriate, since the *Sutera* court made this finding in the context of assessing an expert's opinion about causation according to *Daubert* reliability factors. The fact that a regulatory standard was deemed not to be a measure of causation and thus not to provide support for the expert's opinion in that case is inapposite in the motion to dismiss context in the present case in which the plaintiffs need only plausibly plead significant exposure. Defendants' reliance on *Rhodes v. E.I. du Pont de Nemours and Co.*, 253 F.R.D. 365, 377–78 (S.D.W.Va. 2008) is similarly misplaced, since that opinion dealt with the use of such evidence at the class certification stage rather than at the motion to dismiss phase currently at issue before this Court.

Thus, I am satisfied that plaintiffs have plausibly pled significant exposure and a significantly increased risk of contracting a serious disease. Though an EPA guidance document may prove inadequate to ultimately prove significant exposure, it provides sufficient support at this stage to plausibly plead that plaintiffs have been exposed to a significant level of the toxins at issue. For example, I am satisfied that plaintiffs have plausibly pled significant exposure to

PFCs where they allege that their wells revealed "some of the highest levels of contamination" nationwide, and that one of the wells tested in plaintiffs' communities revealed PFC levels "nearly 20 times in excess of the EPA health advisory." ECF No. 126 at 4–5. While plaintiffs have not yet proven what a significant level of exposure is, they need not do so at this stage, but with the assistance of the EPA guidance they have met their requirement to plausibly plead significant exposure.

However, Tyco and Chemguard argue more convincingly that plaintiffs have not provided any factual allegations as required to plead there exists (a) a monitoring procedure that makes early detection of disease possible, (2) that is different from the monitoring normally recommended in the absence of the exposure, and (3) that is reasonably necessary according to contemporary scientific principles. ECF No. 154 at 12 (citing *Redland Soccer*, 696 A.2d at 145–46). 3M joins in on this contention, emphasizing that plaintiffs have failed to plausibly allege "that medical monitoring testing procedures exist for the latent diseases they identify and that such testing is reasonably necessary and beneficial," which the *Cook* court noted were "required elements" of a claim for medical monitoring. ECF No. 157 at 11.

Tyco and Chemguard point to cases dismissing similarly pled complaints for the failure to identify a particular medical monitoring procedure and to explain how it differs from the monitoring used for all patients with the condition at issue. ECF No. 154 at 13 (citing *In Re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL Nos. 1871, 07-MD-01871, 2011 WL 4006639, at *3 (E.D. Pa. Sept. 7, 2011)). In *Avandia* the plaintiffs asserted that their exposure to a diabetes drug increased their risk of heart disease, thereby requiring medical monitoring. *Id.* at *3. However, the court dismissed plaintiffs' medical monitoring claim based in part on the fact

that plaintiffs failed to specify a monitoring procedure and to explain how it would detect latent heart issues for them in a way that was distinct from the monitoring done for all diabetic patients. *Id.*

Plaintiffs contend, in contrast, that they have adequately pled all required elements of a medical monitoring claim, including the necessity and availability of medical examinations. They assert that they have pled that their increased risk of latent diseases necessitates medical examinations, and that medical examinations are available to assist in the early detection and treatment of these diseases. ECF No. 184 at 10–11. In defense of the sufficiency of their complaint, they note that "[e]xpert testimony is required to prove the elements of medical monitoring, including the appropriate medical examinations or tests." *Id.* at 11 n.11 (citing *Redland Soccer Club*, 696 A.2d at 146, in which the court noted that proof of the elements of a medical monitoring claim "will naturally require expert testimony").

Although I acknowledge the difficulties plaintiffs face in obtaining sufficient facts, I agree with defendants that plaintiffs' Second Amended Complaint lacks the specificity required to assert that medical examinations are reasonable and necessary to detect the claimed diseases. Instead, the complaint asserts only that "[m]edical tests currently exist that can determine the level of PFOA and PFOS in the blood," and that because "bioaccumulation of elevated levels of PFOA and PFOS in an individual's blood significantly increases the risk of contracting a serious medical condition, periodic medical examinations are both reasonable and necessary to detect latent diseases." ECF No. 126 at 50. As defendants point out, this allegation does not contend that medical tests exist to detect the latent diseases alleged, which include kidney and testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension, and

hypercholesterolemia. *Id.* The complaint fails to allege that there are any tests that can predict

these diseases early, but instead alleges only that tests exist to determine the amount of PFOA

and PFOS in the blood. I am thus not satisfied that plaintiffs have satisfactorily pled the required

element that monitoring and testing procedures exist which make the early detection and

treatment of the diseases possible and beneficial. *Cook*, 755 F. Supp. at 1477.

As Judge Babcock noted when he dismissed the plaintiffs' complaint in *Cook* with leave

to amend: "in a case of this magnitude, a district court must retain the power to insist upon some

specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.*

at 1475 (internal quotation marks and citation omitted). Thus, though I dismiss this claim, I do

so without prejudice so that plaintiffs may replead this claim when they have obtained sufficient

facts to plead it with some specificity.[5]

**D. <u>Motion to Certify Question</u>.**

In the event the Court declines to grant dismissal, Tyco and Chemguard move the Court

to certify the question whether Colorado recognizes a cause of action for medical monitoring to

the Colorado Supreme Court. ECF No. 155. Because I have granted the dismissal of plaintiffs'

claim for medical monitoring, this motion is moot.

However, because my dismissal is based on plaintiffs' failure to plead elements of the

claim, which they may remedy, rather than based on a fatal flaw in the medical monitoring

theory itself, I will note that I would not certify this question to the Colorado Supreme Court

even if I were not dismissing plaintiffs' claim on the basis of their failure to adequately plead the

---

[5] The Court is aware of the reports of plaintiff's expert Kenneth Spaeth, M.D., which are the subject of one of defendants' Daubert motions and, in turn, the Court's order on Daubert motions. That is a different matter than the sufficiency of plaintiffs' pleading.

claim. The decision to certify a question of state law "rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). However, federal courts have a duty to decide questions of state law, and should do so even if such questions are "difficult or uncertain." *Copier by & Through Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998). Indeed, courts should decline to certify a question when there is a "reasonably clear and principled course" to follow. *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). Because I have found that there is such a reasonably clear course in this case based on this Court's previous holding in *Cook* and the lack of any clear indicia of changes since that time, I am satisfied that I need not certify this question to the Colorado Supreme Court at this time.

###### E. <u>Conspiracy Claim.</u>

Plaintiffs added a cause of action for civil conspiracy under Colorado law in their Second Amended Complaint. ECF No. 126 at 56. In this claim, plaintiffs assert that defendants "agreed, by words or by conduct, to further" the goal of profiting from the manufacture, sale, and distribution of AFFF despite their awareness of the product's dangers to the environment and human health." *Id.* at 56–57.

3M and Buckeye assert—and plaintiffs appear to concede—that this civil conspiracy claim sounds in fraud insofar as it alleges that defendants attempted to deceive the public and the government about the safety of AFFF. *See* ECF No. 157 at 13; ECF No. 184 at 12 (plaintiffs concede that Rule 9(b) applies to this claim). Thus, because this civil conspiracy claim is based on alleged fraudulent acts, "the fraudulent acts must be pled under the standard of Rule 9(b)." *In re Qwest Commc'ns Intern., Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1153 (D. Colo. 2005). I

agree with defendants 3M and Buckeye that plaintiffs have failed to plead this claim with the requisite specificity.[6] *See* ECF No. 157 at 12–13.

To establish a civil conspiracy in Colorado, plaintiffs must prove "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'" *Qwest*, 387 F. Supp. 2d at 1153. Where a civil conspiracy claim is based on fraudulent acts, those acts must be pled in accordance with Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Tenth Circuit requires "a complaint alleging fraud to 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Koch v. Koch Industs., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (internal citation omitted).

Plaintiffs' complaint contains the following allegations in support of the conspiracy claim: they allege that 3M was aware as early as the 1950s and 1960s that PFCs were potentially toxic and that they accumulate in humans. ECF No. 126 at 40–41. According to plaintiffs, after 1976, "all remaining Defendants came to know what 3M knew: that their own AFFF did not biodegrade, persisted in the environment, and bioaccumulated in human blood." *Id.* at 41.

---

[6] 3M argues as an initial matter that plaintiffs violated Red. R. Civ. P. 15(a)(2) by amending their complaint with a class-based civil conspiracy claim despite assuring the Court and defendants that they would only be adding individual claims. ECF No. 157 at 12–13. Plaintiffs acknowledge that there may have been a "miscommunication" on the nature of their amended complaint. ECF No. 184 at 2 n.1. Because I resolve this issue on the merits, I need not reach this procedural issue. *See Denver & Rio Grande Western R. Co. v. Union Pacific R. Co.*, 119 F.3d 847, 858 (10th Cir. 1997) (policy "favors deciding cases on the merits as opposed to dismissing them because of minor technical defects.").

According to plaintiffs, beginning in the 1970s defendants formed joint task forces, committees, "and otherwise colluded for the avowed purpose of providing information about AFFF containing PFOA and PFOS to the public and to government agencies." ECF No. 126 at 42. Despite this avowed purpose, plaintiffs allege that defendants in fact shared the unlawful purpose of perpetuating the myth that AFFF is biodegradeable, creating a market for AFFF despite knowing the hazards it poses, and concealing the toxic nature of AFFF and its effects on people and the environment. *Id.* Plaintiffs allege that defendants carried out their conspiracy via one or more overt acts, including representing that AFFF was safe and posed no risks, concealing the dangers of the product by ":repeatedly requesting that information about the dangers and health effects . . . be suppressed and not otherwise published," fighting regulation of their product, and "[c]ollectively deciding to use PFOA and/or PFOS rather than other, safer surfactants" because doing so was the most profitable strategy. *Id.* at 42–43. 3M, in particular, was accused of "perpetuating the myth" that its PFCs were biodegradable in 1998. *Id.* at 40.

I am not satisfied that plaintiffs have plausibly pled the existence of a civil conspiracy sounding in fraud with the particularity required by Rule 9(b). The complaint lacks specific allegations of fraud aside from conclusory allegations of misrepresentations. There are no allegations about the "time, place and contents" of any false representations. *Koch*, 203 F.3d at 1236. Plaintiffs urge the Court to relax the standard required for their conspiracy claim, implying—without providing any specifics—that they were unable to obtain information in defendants' exclusive control. ECF No. 184 at 12. Plaintiffs assert that they are not required to "provide specific information about the specific date that a specific individual made specific misrepresentations or omissions." *Id.* (citing *McNees v. Ocwen Loan Servicing*, No. 16-cv-

01055-WJM-KLM, 2018 WL 636598, at *5 (D. Colo. Jan. 31, 2018)). Instead, according to plaintiffs, they need only provide fair notice of the claims and the factual grounds that support those claims. *Id.* (citing *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016)).

It is not clear what information plaintiffs are missing that would be in defendants' exclusive control, especially considering, as defendants point out, that plaintiffs allege that defendants publicly misled the government and the public, so these statements would presumably be publicly available. ECF No. 198 at 4. Even assuming, however, that plaintiffs had some difficulty obtaining information in defendants' control, the allegations they do provide fall far short of even the relaxed standard courts apply in such cases. In *McNees*, for example, the court noted that "some of Plaintiff's allegations are stated with more specificity than others," but it concluded that "when evaluated as a whole," the plaintiff's complaint "contains several specific allegations of fraud." 2018 WL 636598, at *5. The court noted that the plaintiff would not be required "to specifically state who at the Defendant's business made the false billing charges," since that information would be exclusively in the defendant's control. *Id.* However, the plaintiff had alleged "that Defendant, on particular dates and in certain amounts, charged Plaintiff fees that were false representations of the amount Plaintiff actually owed Defendant." *Id.* Thus, though the *McNees* court provided some leeway for information the plaintiff could not be expected to have, it still required that the plaintiff provide specific information about the alleged wrongdoing. Plaintiffs' failure to provide any information in this case as to the nature of the alleged agreements and conspiracy in this case—including, for example, dates, contents, participants—thus falls far short of the standard illustrated in *McNees*.

Similarly, although the Tenth Circuit in *George* did observe that "Rule 9(b)'s purpose is 'to afford [a] defendant fair notice' of a plaintiff's claims and the factual grounds supporting those claims," the *George* court in fact enforced a much higher standard than plaintiffs would have this Court apply. 833 F.3d at 1255 (alteration in original) (citation omitted). The *George* court noted that "general allegations don't suffice," but instead the court was only satisfied by allegations that identified individuals "by name, specif[ied] the dates when those employees made allegedly false statements, identif[ied] the actions the plaintiffs took in reliance on those misrepresentations," and further detailed the injuries plaintiffs suffered as a result. 833 F.3d at 1256. In this case, I agree with defendants that plaintiffs' civil conspiracy claim "lack[s] detail about who allegedly did what, when, and why such actions or statements were false or fraudulent." ECF No. 157 at 4 (citing SAC ¶¶ 178–91, 271–77).

Finally, I agree with defendants that in addition to failing to provide sufficient particularity as to the fraudulent statements, plaintiffs have also failed to explain how defendants participated in a conspiracy with each other rather than merely participating in parallel conduct. *See Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1141 (D. Colo. 2013) ("[A]llegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy.") (internal citations and quotation marks omitted).

As such, 3M's motion to dismiss plaintiffs' civil conspiracy claim is GRANTED; this claim is dismissed without prejudice.

## ORDER

1. ECF No. 154, Tyco and Chemguard's motion to dismiss, is GRANTED. The claims are dismissed without prejudice and with leave to amend.

2. ECF No. 155, Tyco and Chemguard's motion to certify a question, is DENIED.

3. ECF No. 157, 3M's motion to dismiss, is GRANTED. The claims are dismissed without prejudice and with leave to amend.

4. ECF Nos. 159, 160 and 219, motions to join in motions to dismiss, are GRANTED. The moving defendants are granted leave to join, and the rulings on the motions to dismiss are equally applicable to their joinder motions.

5. ECF No. 200 and 202, motions to strike, are DENIED.

6. The Court's order at ECF No. 167 modifying the caption is VACATED.

DATED this 25th day of September, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge