**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No.: 1:16-cv-02351-RBJ
(consolidated)

GREGORY BELL;
JOSE ACEVEDO; and
DENISE DURBIN, individually and as parent
and next friend of K.D. AND B.D.; for
themselves and on behalf of all others similarly
situated,

Plaintiffs,

v.

THE 3M COMPANY (f/k/a Minnesota Mining
and Manufacturing Co.); and TYCO FIRE
PRODUCTS, L.P., successor-in-the interest to
The Ansul Company,

Defendants.

---

**THIRD AMENDED CLASS COMPLAINT WITH INDIVIDUAL CLAIMS AND
DEMAND FOR JURY TRIAL**

---

Plaintiffs David Bell, Deanne Lopez, Rose Francis, Judy Barstad, Yvonne Strachan,

Lorencio Atchley, Patricia Atchley, Carol Flathers, Walter Gale, Pennie Gale, Marilyn Bennett,

Phyllis Taylor, Donald Taylor, Marnello Boddie, Janet Bahner, and Mary Niemetz, by and through

their undersigned counsel, hereby file this Third Amended Class Complaint, individually, and on

behalf of all others similarly situated, with individual claims, and make these allegations based on

information and belief against Defendants, THE 3M COMPANY, f/k/a Minnesota Mining and

Manufacturing, Co.; TYCO FIRE PRODUCTS L.P., successor in interest to THE ANSUL COMPANY; BUCKEYE FIRE PROTECTION CO.; CHEMGUARD; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL FOAM, INC.; WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC., individually and as successor in interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC. (collectively "Defendants"):

## **INTRODUCTION**

1.      The communities of Fountain, Security, and Widefield (collectively the "Communities") are all located south of Colorado Springs, Colorado.

2.      The Communities are located in close proximity to and downgradient of Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

3.      The United States Air Force ("USAF") provided firefighting services to the Colorado Springs Municipal Airport, owned by the City of Colorado Springs through a joint use agreement.  For purposes of this Complaint, the property of Peterson Air Force Base shall include the property of the Colorado Springs Municipal Airport and shall collectively be referred to as "PAFB."

4.      Residents of the Communities receive their potable water either from private wells or from their municipal water provider.

5.      The Communities receive municipal drinking water from the City of Fountain Utilities Department, the Security Water and Sanitation District, and the Widefield Water and Sanitation District.

6.      The Security Water and Sanitation District provides drinking water to approximately 19,000 residential and business customers.

7.      The City of Fountain Utilities Department provides drinking water to approximately 29,000 customers.

8.      The Widefield Water and Sanitation District provides drinking water to approximately 16,000 customers.

9.      On May 2, 2012, the United States Environmental Protection Agency ("USEPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015.

10.     As part of the UCMR3, public water systems are required to sample for six perfluorinated compounds ("PFCs"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS").

11.     In October 2015, the USEPA released results from UCMR3 that indicated the Communities' water supplies were contaminated with PFOA and PFOS.

12.     However, there was no notification to the residents of the Communities that the water was contaminated with PFOA and PFOS.

13.     In May 2016, the USEPA established a drinking water health advisory level for PFOA and PFOS and warned that lifetime exposure to PFOA and PFOS over 70 parts per trillion ("ppt") was linked to the development of numerous serious medical conditions.

14.     In response to the USEPA's establishment of the 70 ppt health advisory level, the Communities' municipal water providers notified the residents in the Communities of the contamination and took action to reduce the PFOA and PFOS levels in the drinking water, including shutting down wells, obtaining and/or purchasing alternative sources of water, and blending clean water with the contaminated water to lower the PFC level in their customers' water.

15.     It was in this same month that Plaintiffs and the Putative Class were first made aware that their drinking water was contaminated with PFCs at hazardous levels and were advised to seek alternate drinking water supplies.

16.     Among the 63 areas nationwide where the USEPA found PFOA and PFOS exceeding the 70 ppt limit, federal data shows that the Communities exhibit some of the highest levels of contamination.[1]

17.     By this time, local newspapers were reporting that federal data showed that the water in all 32 of the Security Water and Sanitation District's municipal wells exhibited PFC

---

[1] Bruce Finley, *Drinking water in three Colorado cities contaminated with toxic chemicals above EPA limits*, DENVER POST, (June 15, 2016 4:08 PM), http://www.denverpost.com/2016/06/15/colorado-widefield-fountain-security-water-chemicals-toxic-epa/.

contamination at levels exceeding the EPA health advisory limit of 70 ppt. At one well, PFC

concentration reached 1,370 ppt, nearly 20 times in excess of the EPA health advisory.[2]

18.     EPA officials recommended that pregnant women and small children should not

drink local water serving the Communities.[3]

19.     Subsequent investigations into the contamination were carried out by the United

States Army Corps of Engineers on behalf of the USAF and the Colorado Department of Public

Health & Environment ("CDPHE") and have uncovered widespread PFC contamination of the

groundwater resources for the Communities.[4]

20.     These investigations also concluded that the basis for this widespread

contamination of the Communities' ground water is decades of use, storage, and disposal of

aqueous film-forming foam ("AFFF") at PAFB that contained PFOA and PFOS.

21.     The CDPHE horizontally delineated the PFC plumes, designating these plumes as

"Areas of Investigation" ("CDPHE Areas of Investigation").

22.     Defendants manufactured, sold, and distributed AFFF to PAFB despite their

awareness that the inclusion of PFOA and PFOS in AFFF presented an unreasonable risk to human

health and the environment and was inherently dangerous.

---

[2] *Id.*

[3] *Id*.

[4] U.S. Army Corps of Engineers, *Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base El Paso County, Colorado*, (November 2016), http://www.peterson.af.mil/Portals/15/documents/Public%20Notices/552503_Revised%20Final%20Peterson%20AFB%20PA_11_2016.pdf?ver=2017-05-16-162140-693.

23.     The Defendants also knew that both PFOA and PFOS were highly soluble and mobile in water, highly likely to contaminate water supplies, highly persistent in the environment, and known to bioaccumulate in humans and contribute to the development of numerous serious health conditions, especially for sensitive receptors such as young children and pregnant and nursing women.

24.     The Defendants marketed and sold their products with knowledge that the USAF and PAFB would use large quantities of AFFF containing PFOA and PFOS in training operations and in emergency fire-fighting situations at military bases and airports in such a manner that PFOA and PFOS would contaminate the air, soil, and groundwater.

25.     The Defendants marketed and sold their products with knowledge that large quantities of AFFF containing PFOA and PFOS would be stored in fire suppressant systems and tanks on USAF Bases and at airports, including PAFB, and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the air, soil, and groundwater.

26.     The Defendants failed in their duty to manufacture a product that would not cause widespread harm and in their duty to warn the United States Department of Defense ("DOD"), the USAF, PAFB, the municipal water providers, and the residents in the surrounding Communities of the inherently dangerous properties of their AFFF products.

27.     The Putative Class represents over 64,000 residents of Fountain, Security, and Widefield who were exposed to PFOA- and PFOS- contaminated drinking water from the City of

Fountain, the Security Water and Sanitation District, the Widefield Water and Sanitation District, and private wells, all of which obtain groundwater from the CDPHE Areas of Investigation.

**Health Effects of PFOS and PFOA Exposure**

28.     Scientific studies of PFOA and PFOS and have concluded that exposure to PFOA and PFOS is associated with the development of numerous serious medical conditions.

29.     PFOA, sometimes identified as C8 due to the common presence of eight carbons in the PFOA molecule, was the subject of a study formed out of a class action settlement arising out of water contamination from DuPont's Washington Works located in Wood County, West Virginia.

30.     The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a link between PFOA exposure and human diseases.

31.     In 2012, the Panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

32.     In May 2015, based on concerns about the production and release of PFOA into the environment, scientists and other professionals from a variety of disciplines issued the "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," a policy statement calling for greater regulation, restrictions, and limits on the manufacture and handling of any product containing

PFOA, as well as the development of safe, non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[5]

33.     In May 2016, the USEPA issued Lifetime Health Advisories advising against lifetime PFOA and PFOS exposure above 70 ppt.

34.     The USEPA's 70 ppt limit is designed to protect the population at large from exposure to harmful concentrations of PFOA and PFOS in drinking water above which adverse health effects are anticipated to occur.[6]

35.     According to the USEPA Lifetime Health Advisory, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA.

36.     Many states, however, have issued lower regulatory limits.  For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level of 14 ppt for PFOA.

37.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects

---

[5] Arlene Blum et al., Brief Communication, *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, 123 Env't Health Perspectives A107, A107-11 (2015), http://dx.doi.org/10.1289/ehp.1509934.
[6] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[7]

38.     The IARC concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[8]

39.     On November 10, 2017, California listed PFOA and PFOS as chemicals known to the state to cause reproductive toxicity, pursuant to Proposition 65, The Safe Drinking Water and Toxic Enforcement Act of 1986.

40.     In November 2017, Congress passed the National Defense Authorization Act ("NDAA"), legislation which set aside $42 million to remediate PFOA and PFOS contamination from military bases.  As part of the NDAA, an additional $7 million was devoted to the Investing in Testing Act, which authorizes the Centers for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

41.     Colorado currently follows the USEPA Lifetime Health Advisory level of 70 ppt for combined lifetime exposure to PFOA and PFOS.

---

[7] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.
[8] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

**Plaintiff's and the Putative Class' Exposure and Damages**

42.     Years of ingestion and dermal absorption of contaminated water from the Fountain, Security, and Widefield water districts have significantly exposed unknowing residents of the Communities to PFCs at concentrations hazardous to their health.

43.     Plaintiffs and the Putative Class have been injured as a result of receiving and/or consuming water with elevated levels of PFCs, including PFOA and PFOS, for years.

44.     Plaintiffs and the Putative Class have been injured due to PFC contamination of the municipal and private water supplies caused by Defendants' manufacture, distribution, and sale of AFFF.  Their injuries include significant exposure to elevated levels of PFCs putting them at an increased risk of contracting serious latent diseases, bioaccumulation of PFCs in their blood, personal injury, property damage, and the diminution of property values.

45.     The properties of the Plaintiffs and the Putative Class have been damaged due to the presence of PFCs in their homes, soil, surrounding property, and potable water supply.

46.     Plaintiffs and the Putative Class seek recovery from all Defendants for injuries, damages, and losses suffered by the Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFC-contaminated water from the municipal and private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2) in that this action is between citizens of different States and seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs, and attorneys' fees .

48.     This Court has jurisdiction over Defendants pursuant to C.R.S. § 13-1-124.

49.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District of Colorado and caused harm to Plaintiffs and the Class Members, all of whom reside in this District.

## THE PARTIES

### Class Representatives with Individual Personal Injury and Property Damage Claims

50.     Plaintiff Deanne Lopez is a resident of Colorado Springs, Colorado, who currently resides at 776 Kisker Court, Colorado Springs, Colorado 80911. She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Deanne Lopez has been exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Deanne Lopez has been diagnosed with pregnancy problems, miscarriages, and reproductive problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high

cholesterol levels, changes in thyroid hormone, and kidney cancer.

51.     Plaintiff Rose Francis is a resident of Colorado Springs, Colorado, who currently resides at 4040 Sinnes Drive, Colorado Springs, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Rose Francis has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Rose Francis has been diagnosed with kidney problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

52.     Plaintiff Judy Barstad is a resident of Colorado Springs, Colorado, who currently resides at 7555 Sunny View Lane, Colorado Springs, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Judy Barstad has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Plaintiff Judy Barstad has been diagnosed with kidney disease, and is at a significantly increased risk of developing serious latent diseases, including but not limited

to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

53.    Plaintiff Yvonne Strachan is a resident of Colorado Springs, Colorado, who currently resides at 7192 Cliffrose Drive, Colorado Springs, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Yvonne Strachan has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Yvonne Strachan has been diagnosed with pregnancy problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

54.    Plaintiff Patricia Atchley is a resident of Colorado Springs, Colorado, who currently resides at 8102 Silver Glen Drive, Fountain, Colorado 80817.  She owns the property with her husband Lorencio Atchley.  They currently receive water from a municipal well owned by the City of Fountain Utilities Department. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Patricia Atchley has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Patricia Atchley has been diagnosed with

thyroid disease, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, and kidney cancer.

55.     Plaintiffs Walter Gale and Pennie Gale are residents of Colorado Springs, Colorado, who currently reside at 35 Monk Street, Colorado Springs, Colorado 80911.  They own the property and currently receive water from a municipal well owned by the Widefield Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiffs Walter Gale and Pennie Gale have been significantly exposed to elevated levels of PFCs and have a bioaccumulation of PFCs in their blood.

56.     As a result of exposure to PFOA and PFOS in the contaminated water supply, Walter Gale has been diagnosed with thyroid disease and ulcerative colitis.   Walter Gale is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, and testicular and kidney cancer.

57.     As a result of exposure to PFOA and PFOS in the contaminated water supply, Pennie Gale has been diagnosed with thyroid disease, high cholesterol, and kidney disease. Pennie Gale is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

58.     Plaintiff Marilyn Bennett is a resident of Fountain, Colorado, who currently resides at 222 Oriole Street, Fountain, Colorado 80817.  She is the owner of the property and she currently receives water from a municipal well owned by the City of Fountain Utilities

Department.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Marilyn Bennet has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Marilyn Bennett has been diagnosed with high blood pressure, thyroid abnormalities, ulcerative colitis, high cholesterol, and kidney disease, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.

59.     Plaintiffs Phyllis Taylor and Donald Taylor are residents of Colorado Springs, Colorado, who currently reside at 5185 Almont Avenue, Colorado Springs, Colorado 80911. They own the property and currently receive water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiffs Phyllis Taylor and Donald Taylor have been significantly exposed to elevated levels of PFCs and have a bioaccumulation of PFCs in their blood.

60.     As a result of exposure to PFOA and PFOS in the contaminated water supply, Phyllis Taylor has been diagnosed with high blood pressure, high cholesterol, and thyroid disease and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

61.     As a result of exposure to PFOA and PFOS in the contaminated water supply,

Donald Taylor has been diagnosed with high blood pressure and high cholesterol, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and testicular and kidney cancer.

62.     Plaintiff Marnello Boddie is a resident of Security, Colorado, who currently resides at 5465 Espano Drive, Security, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Marnello Boddie has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Marnello Boddie has been diagnosed with high blood pressure, thyroid disease, and pregnancy problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

63.     Plaintiff Janet Bahner is a resident of Colorado Springs, Colorado, who currently resides at 7450 Caballero Avenue, Colorado Springs, Colorado 80911.  She is the owner of the property and she currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Janet Bahner has been significantly

exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Janet Bahner has been diagnosed with high cholesterol, high blood pressure, pregnancy problems, and asthma, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.

64.     Plaintiff Mary Niemetz is a resident of Colorado Springs, Colorado, who currently resides at 112 Steven Drive, Colorado Springs, Colorado 80911.   She is the owner of the property and she currently receives water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Mary Niemetz has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.   As a result of exposure to PFOA and PFOS in the contaminated water supply, Mary Niemetz has been diagnosed with irritable bowel syndrome, hypothyroidism, high blood pressure, and high cholesterol, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

**Class Representatives without Individual Personal Injury Claims**

65.     Plaintiff David Bell is a resident of Colorado Springs, Colorado, who currently resides at 4140 Chenango Drive, Colorado Springs, CO 80911.   He is the owner of the property and he currently receives water from a municipal well owned by the Security Water and Sanitation District.   PFCs have entered the property and soil, including but not limited to through the

accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff David Bell has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in his blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, David Bell is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and testicular and kidney cancer.

66.    Plaintiff Carol Flathers is a resident of Fountain, Colorado, who currently resides at 11945 Orleans Road, Fountain, Colorado 80817.  She is the owner of the property and she currently receives her water from a private well.  PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Carol Flathers has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Carol Flathers is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

67.    Plaintiff Lorencio Atchley is a resident of Colorado Springs, Colorado, who currently resides at 8102 Silver Glen Drive, Fountain, Colorado 80817.  He owns the property with his wife Patricia Atchley.  They currently receive water from a municipal well owned by the City of Fountain Utilities Department. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Lorencio Atchley has been significantly exposed to elevated

levels of PFCs and has a bioaccumulation of PFCs in his blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Lorencio Atchley is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and testicular and kidney cancer.

### Defendants

68.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

69.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

70.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally, and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants, or employees, or due to the ownership, maintenance, or control of the instrumentality causing them injury, or in some other actionable manner.

71.     Defendant THE 3M COMPANY ("3M") is, upon information and belief, an American multinational corporation based in Maplewood, Minnesota and incorporated in

Delaware. 3M was founded in 1902 as the Minnesota Mining and Manufacturing Company.  With approximately $30 billion in annual net sales, 3M employs approximately 90,000 people, operates in approximately 70 countries, and produces more than 55,000 products.  3M does business throughout the United States, including in the state of Colorado.

72.     3M designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

73.     3M is engaged in substantial and not isolated activity in this State; all as more fully alleged herein.

74.     Defendant TYCO FIRE PRODUCTS L.P., successor in interest to THE ANSUL COMPANY ("TYCO"), is a Delaware corporation having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.  TYCO manufactured and currently manufactures the ANSUL brand of products, including ANSUL brand AFFF.

75.     Upon information and belief, Defendant TYCO is the successor in interest to the corporation formerly known as THE ANSUL COMPANY ("ANSUL").  This Complaint shall collectively refer to ANSUL and/or TYCO as the successor in interest to ANSUL as "TYCO/ANSUL."  At all times relevant, TYCO/ANSUL designed, manufactured and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

76.     Defendant BUCKEYE FIRE EQUIPMENT COMPANY ("BUCKEYE") is a North Carolina corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.

77.     At all times relevant to the present litigation, BUCKEYE designed, manufactured and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

78.     Defendant CHEMGUARD is a Wisconsin corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

79.     At all times relevant to the present litigation, CHEMGUARD designed, manufactured and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

80.     Defendant NATIONAL FOAM, INC. ("NATIONAL FOAM") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.  At all times relevant, NATIONAL FOAM designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

81.     Defendant KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM INC., is a North Carolina corporation having a principal place of business at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615.  At all times relevant, KIDDE FIRE FIGHTING, INC. designed, manufactured and sold AFFF used in training

operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

82.     KIDDE FIRE FIGHTING, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

83.     KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., is a Connecticut corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302.  At all times relevant, KIDDE PLC, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

84.     KIDDE PLC, INC., is sued individually, as a successor in interest to NATIONAL FOAM, INC.

85.     Upon information and belief, WILLIAMS HOLDINGS, INC. was incorporated on October 10, 1987, and later dissolved on December 31, 1990.  Upon information and belief, John F. Hannon was the CEO and Secretary of WILLIAMS HOLDINGS, INC.  At all times relevant, WILLIAMS HOLDINGS, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

86.     Upon information and belief, WILLIAMS CORPORATION was founded in 1997, and dissolved on October 26, 2000.  Upon information and belief, John F. Hannon was the CEO of WILLIAMS CORPORATION, as well as the Treasurer of KIDDE FIRE FIGHTING, INC. prior to the dissolution of WILLIAMS CORPORATION.

87.     Upon information and belief, WILLIAMS HOLDINGS, INC., a Delaware corporation, filed as a foreign corporation with the Massachusetts Secretary of State on June 2, 1987.

88.     Upon information and belief, John F. Hannon changed the name of WILLIAMS HOLDINGS, INC. to WILLIAMS HOLDINGS US, INC., on February 12, 1998.

89.     Upon information and belief, WILLIAMS HOLDINGS US, INC. became KIDDE PLC, INC. on November 15, 2000.

90.     WILLIAMS HOLDINGS, INC. is sued individually, and as successor in interest to NATIONAL FOAM, INC.

91.     KIDDE-FENWAL, INC., is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721.  At all times relevant, KIDDE-FENWAL, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, airports, and other locations throughout the country, including at PAFB.

92.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to KIDDE-FENWAL, INC.

93.     Upon information and belief, the Canadian Intellectual Property Office has registered the NATIONAL FOAM trademark to KIDDE-FENWAL, INC., formerly registered to KIDDE FIRE FIGHTING, INC.

94.     KIDDE-FENWAL, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

95.     UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC., is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant, UTC FIRE & SECURITY AMERICAS CORPORATION, INC. designed, manufactured and sold AFFF used for training operations and fighting fires at numerous military bases, airports, and other locations throughout the country, including at PAFB.

96.     Upon information and belief, KIDDE-FENWAL, INC. is part of the UTC Climate Control & Security Unit of United Technologies Corporation.

97.     UTC FIRE & SECURITY AMERICAS CORPORATION, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

98.     [On April 4, 2018, Plaintiffs voluntarily dismissed ENTERRA CORPORATION, without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  *See* ECF No. 210].

99.     [On April 4, 2018, Plaintiffs voluntarily dismissed ENTERRA CORPORATION, without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  *See* ECF No. 210].

100.    [On April 4, 2018, Plaintiffs voluntarily dismissed ENTERRA CORPORATION, without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  *See* ECF No. 210].

101.    NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL FOAM, INC.; WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL

FOAM, INC.; KIDDE-FENWAL, INC., individually and as successor in interest to NATIONAL

FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE

INTERLOGIX, INC. shall collectively be referred to herein as "NATIONAL FOAM."

102.    At all times relevant to the present litigation, NATIONAL FOAM designed,

manufactured, and sold AFFF used in training operations and for emergency fire-fighting

situations at numerous military bases, airports, and other locations throughout the country,

including at PAFB.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

103.    AFFF is a Class-B fire-fighting foam that is mixed with water and used to

extinguish fires that are difficult to fight, including those involving hydrocarbon fuels such as

petroleum or other flammable liquids.

104.    AFFF is synthetically formed by combining fluorine free hydrocarbon foaming

agents with surfactants.  When mixed with water, the resulting solution produces an aqueous film

that spreads across the surface of hydrocarbon fuel.  This film provides fire extinguishment and is

the source of the designation "aqueous film forming foam."

105.    AFFF has a better fire-fighting capability than plain water due to the presence of

fluorinated surfactants that lower the water's surface tension, essentially smothering the fire and

starving it of its oxygen.

106.    Some fluorinated surfactants have unique properties that cause some of the

compounds to persist in the environment and toxically bioaccumulate in animals and humans.

107.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary fire-fighting foam in the United States and in many parts of the world.

108.    Unlike commercial AFFF formulations, AFFF sold to the United States military must conform to the military-specific performance and quality control measurements as prescribed by the military specification ("Mil-Spec") Mil-F-24385.

109.    There was no requirement to use either PFOA or PFOS under Mil-F-24385.

110.    Defendants 3M, TYCO/ANSUL, NATIONAL FOAM, CHEMGUARD and BUCKEYE were all on the DOD Qualified Products Listing ("QPL") as manufacturers certified to sell AFFF under Mil-F-24385 at various times from 1976 through 2017.

111.    Defendants 3M, TYCO/ANSUL, NATIONAL FOAM, CHEMGUARD and BUCKEYE designed, manufactured, and sold AFFF that was used at PAFB.

112.    The United States Navy first used AFFF in 1963, with the USAF commencing its use of AFFF in 1970.

113.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

114.    The USAF uses 3% AFFF for its installations.

115.    Fluorosurfactants used in 3M's AFFF were produced by a unique and patented process known as electrochemical fluorination ("ECF").  The ECF process resulted in a product that contains PFOS, some of which degrades into PFOA.

116.    3M was the only company to manufacture PFOS-containing AFFF.

117.    In an attempt to limit liability, 3M opted to stop producing PFOS in 2002 because it was aware of the widespread contamination and the health effects on the American public associated with exposure to the contamination.

118.    Like PFOS, PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and can be used to repel oil, stains, grease, and water.

119.    In 1947, 3M began producing PFOA via ECF.

120.    In 1951, 3M began selling its PFOA to other chemical companies, including DuPont.

121.    Other companies, including Defendants TYCO/ANSUL, BUCKEYE, NATIONAL FOAM, and CHEMGUARD, began manufacturing AFFF using PFOA that they produced themselves or purchased from other companies.  Defendants then sold AFFF to the USAF for use at installations across the country, including PAFB.

122.    The chemical structure of PFOA and PFOS make them resistant to breakdown or environmental degradation.  As a result, they are persistent when released into the environment.

123.    PFOA and PFOS have been found to bioaccumulate in humans and animals.  In 2005, the United States Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

124.    By the early 1960s, 3M knew that PFOA and PFOS were stable, persistent in the environment, and did not degrade.

125.    As a result of this persistence, they can remain in the environment, particularly in water, for many years and can move through air, soil, and into groundwater.

126.    Early studies showed that PFCs accumulated in the human body and were toxic.

127.    3M studies from the 1970s concluded that PFCs were "even more toxic" than previously believed.

128.    3M knew that PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver.

129.    Upon information and belief, by the 1970s, 3M knew that PFOA and PFOS were widely present in the blood of the general U.S. population.  Upon information and belief, 3M concealed this knowledge from the public and government regulators, including those officials responsible for buying and supplying PAFB with AFFF.

130.    In or about 1977, TYCO/ANSUL was also aware of the environmental and toxic effects of AFFF and studied whether it could develop an AFFF that produced less of an environmental impact.

131.    Because of PFOA's toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the USEPA's PFOA Stewardship Program.  The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

132.    Human studies show associations between increased PFOA levels in blood and an increased risk of developing numerous serious medical conditions, including high cholesterol

levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

133.    These injuries can arise months or years after exposure to PFOA.

134.    As alleged in paragraph 35, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA, meaning injuries associated with PFOS exposure and accumulation similarly manifest themselves months or years after the initial exposure.

135.    Given the extreme persistence of PFOS and PFOA in the environment, these chemicals' toxicity, mobility, and bioaccumulation potential has created an ongoing and concrete threat to the health of the residents in the Communities.

136.    Consumption of elevated levels of PFOA/PFOS from contaminated water will lead to elevated serum PFOA/PFOS levels with evidence that for every 10 parts per trillion (ppt) consumed from contaminated water, serum levels increase by 25%, thereby causing a doubling of serum levels at 40 ppt.  Once biological uptake occurs, the clinical effect can be proximate to the exposure or following a latency or both.

137.     Given that the long-term health effects of PFOA/PFOS have not been exhaustively studied, and given that, based on studies that have been done, there is compelling evidence that both malignant and nonmalignant effects result from PFOA/PFOS exposure, and because the full extent of latency of such effects has not yet been determined, periodic diagnostic medical exams for populations with PFOA/PFOS exposure from contaminated drinking water are reasonably necessary.

138.    Sustained exposure to PFOA/PFOS substantially increases the risk to the Plaintiffs and the Class Members of contracting the serious latent diseases alleged herein.

139.    As a result of the sustained exposure and substantial increased risk of contracting the serious latent diseases alleged herein, periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to permit early detection of latent diseases in the Plaintiffs and the Class Members.

140.    Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOA and PFOS possible and beneficial. These may include a comprehensive medical questionnaire completed by the patient; periodic and comprehensive medical examinations by qualified licensed medical professionals; and specific testing based on the patient's history, PFOA/PFOS exposure, symptoms or health consequences, clinical considerations and/or medical examination results.   Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

141.    For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follows:

> (a) Thyroid function:
>
> > (1) Thyroid stimulating hormone (TSH); and
> >
> > (2) Free thyroxine (FT4)
>
> (b) Liver function:
>
> > (1) Albumin;

(2) Aspartate Aminotransferase (AST/SGOT);

(3) Alanine Aminotransferase (ALT/SGPT);

(4) γ-glutamyltransferase (GGT);

(5) Bilirubin; and

(6) Alkaline Phosphatase

(c) Uric Acid:

(1) Serum

(d) Kidney Cancer:

(1) Urinalysis

(e) Lipids:

(1) Total cholesterol;

(2) High-density lipoprotein (HDL);

(3) Low-densitylipoprotein (LDL); and

(4) Total triglycerides

(f) Evaluation for testicular cancer:

(1) Scrotal ultrasound followed by radiographic testing, measurement of serum tumor markers;

(2) Radical inguinal orchiectomy; and/or

(3) Retroperitoneal lymph node dissection

(g) Evaluation for kidney cancer:

(1) Urine culture;

        (2) Ultrasound of kidneys;

        (3) Abdominal pelvic CT scan; and/or

        (4) Cystoscopy

(h) Reproductive/infertility issues:

        (1) Evaluation by a fertility specialist if, after 12 months, a couple has failed to conceive

(i) Gestational hypertension:

        (1) Screening for evidence of gestational hypertension and pre-eclampsia for women in their second and third trimesters of pregnancy

(j) Androgen dysregulation:

        (1) Evaluations to assess androgen levels

(k) Indications of ulcerative colitis:

        (1) Evaluation of erythrocyte sedimentation rate;

        (2) Evaluation of serum C-reactive protein; and/or

        (3) Colonoscopic evaluation

142.    Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

**AFFF Usage at Peterson Air Force Base and the Colorado Springs Municipal Airport**

143.    Upon information and belief, Defendants each manufactured AFFF containing PFOA and PFOS for sale to the DOD or the USAF with knowledge that AFFF would be used in training operations and for emergency fire-fighting situations.

144.    Upon information and belief, Defendants' AFFF products were sold to and used at PAFB.

145.    At any given time, the Defendants were responsible for the design, manufacture, and sale of thousands of gallons of AFFF concentrate used and stored at PAFB.

146.    The AFFF was expected to and did reach PAFB without substantial change in the condition in which the Defendants sold it.

147.    For decades, USAF personnel used AFFF designed, manufactured, and sold by each of the Defendants for training operations at PAFB, including fire-fighting and explosion training.

148.    Due to these training operations, AFFF was released into the surrounding air, soil, and groundwater at locations including but not limited to the current fire training area ("FTA") (1991 to date), the former FTA known as Site 5 (1960 through 1977), and the former FTA known as Site 8 (1977 to 1991).

149.    AFFF was additionally introduced into the groundwater via aircraft hangers containing fire suppression systems that used AFFF. During function testing or false alarms, AFFF was permitted to enter the air, soil, and groundwater, further contaminating Plaintiffs' drinking water.

150.    At PAFB, two fire stations conduct spray testing with AFFF, releasing AFFF into the soil, air, and groundwater.

151.    In November 2016, the U.S. Army Corps of Engineers published "Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base," a report that confirmed the use of AFFF at PAFB and identified fire training areas at PAFB as possible sources of PFC contamination of the Communities' groundwater supply.[9]

152.    As a direct and proximate result of the failure to warn the USAF, PAFB, or the surrounding Communities, including those most sensitive to contamination, AFFF and its constituents were permitted to enter the air, soil, and groundwater, ultimately entering the Plaintiffs' and the Putative Classes' bodies and properties.

153.    Upon information and belief, instructions, warning labels, and material safety data sheets that Defendants provided with the AFFF did not reasonably nor adequately describe the health and environmental hazards of AFFF that Defendants knew or should have known.

## CLASS ACTION ALLEGATIONS

154.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

155.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed sub-classes and seek to certify and

---

[9] Revised Preliminary Assessment Report, *supra*, note 4.

maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

a.   **Medical Monitoring Class**: Individuals who received water provided by their municipal water supplier, smaller water systems, or domestic water supply wells in the CDPHE Areas of Investigation ("Medical Monitoring Class"). This Class is composed of the following sub-classes:

> i.    All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the Security Water and Sanitation District (the "Security Water Sub-Class");
>
> ii.   All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the Widefield Water and Sanitation District (the "Widefield Water Sub-Class");
>
> iii.  All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the City of Fountain Utilities Department (the "Fountain Water Sub-Class"); and
>
> iv.   All individuals who reside or resided within the CDPHE Areas of Investigation who received water from smaller water systems or domestic water supply wells (the "Private Water Sub-Class").

b.   **Property Damage Class**: Individuals who own real property in the CDPHE Areas of Investigation serviced by the three water districts, Fountain, Security, and Widefield, or those who have private water wells in the CDPHE investigative areas ("Property Damage Class"). This class can be readily ascertained by Census data, property records, and county records.

156.   Plaintiffs are members of the proposed Sub-Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

157.   Excluded from the Classes are:

      i.     Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representatives, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

     ii.     The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

   iii.     Any Class counsel or their immediate family members; and

   iv.     All governmental entities.

158.    Plaintiffs reserve the right to amend the Class and Sub-Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional sub-classes, or modified in any other way.

### Numerosity and Ascertainability

159.    This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because the number of impacted individuals in the CDPHE Areas of Investigation and property owners, upon information and belief, have reached the thousands, making individual joinder of Class Members' respective claims impracticable.  While the exact number of Class Members is not yet known, a precise number can be ascertained from objective criteria such as U.S. Federal Census records, the State of Colorado, and the public records of the municipal entities, and through other appropriate discovery.  The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and ease the administrative burden on the Court.  It is expected that the Class Members will number in the tens of thousands.

160.    Finally, Class Members can be notified of the pendency of this action by Court-approved notice methods.

**Typicality**

161.    Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants.  Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of PFOA, PFOS, and other PFCs into the municipal water supplies operated in the CDPHE Areas of Investigation as well as private wells in the area, causing personal injury and property damages.

162.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

**Adequacy of Representation**

163.    Plaintiffs will serve as fair and adequate class representatives because their interests, as well as the interests of their counsel, do not conflict with the interests of other members of the Class they seek to represent.

164.    Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

165.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel has interests adverse to the Class.

### Predominance of Common Issues

166.    There are numerous questions of law and fact common to Plaintiffs and Class

Members that predominate over any question affecting only individual Class Members, making it

appropriate to bring this action under Rule 23(b)(3).  The answers to these common questions will

advance resolution of the litigation as to all Class Members.  Common legal and factual issues

include:

i.    Whether Defendants engaged in the conduct alleged herein;

ii.    Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks;

iii.    Whether Defendants knew or should have known that manufacturing AFFF containing PFOA and PFOS was unreasonably dangerous;

iv.    Whether Defendants knew or should have known that PFOA and PFOS were persistent, stable, and mobile chemicals that were likely to contaminate groundwater water supplies;

v.    Whether Defendants failed to sufficiently warn of the potential for harm that resulted from the use of their products;

vi.    Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users, Plaintiffs, and the Class of same;

vii.    The extent to which Defendants knew about the PFOA and PFOS contamination in the groundwater in the CDPHE Areas of Investigation, including the water supply systems and private wells of residents in the Communities;

viii.    Whether the Defendants owed a duty to Plaintiffs and the Classes to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS;

ix.    Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS;

x.    For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOA and PFOS while living in Security, Widefield, and Fountain;

     xi.     For the Property Damage Class, whether the PFOA and PFOS contamination caused and continues:

          1.    To cause a continuous invasion of the property rights of the Plaintiffs and Class such that the property values within the CDPHE Areas of Investigation have and/or continue to decline in value following the disclosure of the PFOA and PFOS contamination;

          2.    To substantially interfere with Plaintiffs' and the Class' use and enjoyment of their property;

     xii.    Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount;

     xiii.   Whether the members of the Classes and Sub-Classes have sustained damages and the proper measure of damages;

     xiv.   Whether Defendants are strictly liable to Plaintiffs and the Class for their actions; and

     xv.    Whether Defendants are liable to Plaintiffs and the Class for their actions.

### Superiority

167.    The class action mechanism is superior to any other available means of fairly and efficiently adjudicating this case. Given that the CDPHE Areas of Investigation consist of a great number of individuals impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

**AFFF CONTAINING PFOA AND PFOS IS FUNGIBLE AND
COMMINGLED IN THE GROUNDWATER**

168.    Once AFFF containing PFOA and PFOS has been released into the environment, it

lacks characteristics that would otherwise enable the identification of the company that

manufactured that particular batch of AFFF.

169.    Decades of manufacturing, selling, and distributing AFFF has created complex and

opaque arrangements whereby Defendants regularly contract with multiple entities, including the

DOD, the USAF, specific installations, and/or third-party logistic intermediaries, to sell and

deliver AFFF to bases throughout the country, including to PAFB.

170.    A subsurface plume, even if it comes from a single location, such as a retention

pond or fire training area, originates from mixed batches of AFFF coming from different

manufacturers.

171.    At PAFB, AFFF from different manufacturers was used at multiple training sites

over the course of many years, rendering it impossible for investigators to identify with any

certainty the exact AFFF product that produced the PFOA or PFOS at issue.

172.    Even if investigators could track the source of a subsurface plume to a single

location at PAFB, it would be impossible to identify how an individual Defendants' AFFF

contributed to the contamination because of how AFFF was used, stored, and disposed of at those

locations.

173.    The case at PAFB is typical of PFOA and PFOS contamination cases generally:

even though several areas were located at PAFB where the AFFF was used and entered the

groundwater, neither the federal or state investigators could determine which manufacturers' AFFF containing PFOA and PFOS had contributed to the resulting groundwater contamination plume.

174.     PFOA and PFOS is present in all Defendants' AFFF products.

175.     Because precise identification of the manufacturer of the specific AFFF that was the source of PFOA and PFOS found in a Class Members' blood and groundwater is impossible, and the market for AFFF is ascertainable, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiffs and the Class.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

176.     Upon information and belief, Defendants in this action are manufacturers that control a substantial share of the market for AFFF containing PFOA and PFOS in the United States and are jointly responsible for the contamination of the groundwater in the Communities and for causing the damages and injuries complained of in this Complaint.

177.     Each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and/or PFOS during the relevant time.

178.     Market share liability attaches to all Defendants and the liability of each should be assigned according to each Defendant's percentage share of the market for AFFF containing PFOA and PFOS at issue in this Complaint.  As alleged in paragraphs 168-175, PFOA and PFOS is

fungible; it is impossible to identify the exact Defendant who manufactured the particular AFFF containing PFOA and/or PFOS that has contaminated the air, soil, or groundwater.

179.    The relevant product and geographic market can be defined in this instance because the market for AFFF produced pursuant to military specifications consists of only one buyer, PAFB via the USAF, who used this product for only one purpose, to fight fires.

180.    The market for AFFF produced in accordance with military specifications is ascertainable through standard discovery means.

181.    It would be unfair to require Plaintiffs and the Class to bear the entire cost of their injuries simply because it is inherently impossible for the Plaintiffs to identify the exact Defendant that has manufactured the product that has contaminated the water supply and gives rise to the injuries complained of in this action.

182.    Alternatively, concert of action liability attaches to all Defendants based on their participation in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOA and PFOS.

183.    Alternatively, as a result of Defendants' participation in the military grade fire-fighting foam industry through the production, sale, and distribution of AFFF containing PFOA and PFOS pursuant to military specifications, enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

**CONSPIRACY**

[The Court dismissed Plaintiffs' Fifth Cause of Action: Civil Conspiracy without prejudice pursuant to its Order dated September 25, 2018.  *See* ECF No. 326].

## CAUSES OF ACTION FOR CLASS ACTION AND INDIVIDUAL CLAIMS

### AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE

184.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

185.    This cause of action is brought pursuant to Colorado law.

186.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to human health.

187.    Given that Defendants were aware of these chemicals' potential for bioaccumulation in humans as well as the links to numerous serious medical conditions, including cancer, Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and PFOS would be hazardous to human health.

188.    Defendants knew or should have known that PFOA and PFOS are highly soluble in water, highly mobile, extremely persistent in the environment, and therefore high likely to contaminate water supplies if released into the environment.

189.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and PFOS would result in the contamination of the municipal and private well drinking water supplies of the Communities given their proximity to PAFB.

190.    Defendants marketed and sold their products with knowledge that AFFF containing PFOA and PFOS would be used in training exercises and in emergency fire-fighting situations at military bases and airports, including PAFB, in such a manner that these dangerous chemicals would be released into the environment.

191.    Defendants marketed and sold their products with knowledge that AFFF containing toxic PFCs would be stored in fire suppressant systems and tanks on USAF Bases and at airports, including PAFB, and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

192.    Knowing of the dangerous and hazardous properties of AFFF, and the manner in which AFFF would be used, stored, and maintained at PAFB, it was foreseeable that AFFF would contaminate the surrounding environment, groundwater, and drinking water supplies of Fountain, Security, and Widefield, as a result of the Communities' proximity to PAFB.

193.    Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding groundwater and drinking water supplies.

194.    Given the foreseeability of AFFF's release into the surrounding Communities' drinking water, Defendants should have acted reasonably by not placing inherently dangerous AFFF into the marketplace.

195.    Though AFFF is effective at extinguishing otherwise difficult to fight fires, the potential for widespread and persistent contamination of municipal and private well water supplies

with chemicals linked to the development of numerous serious medical conditions far outweighs any social utility gained from AFFF's fire-fighting ability.

196. The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs and the Class was minimal, as the practical consequences of placing this burden on the Defendants amounted to providing adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

197. As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

198. Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants therefore owed multiple cognizable duties to Plaintiffs and the Class.

199. Defendants had a duty to warn of the hazards associated with AFFF containing PFOA and PFOS entering and poisoning the environment and groundwater.

200. As manufacturers, marketers, and sellers of AFFF, Defendants owed Plaintiffs and the Class a duty to exercise reasonable care and ensure that AFFF was manufactured, marketed, and sold in such a way that the end users of AFFF were aware of the potential harm PFOA and PFOS could cause to human health and the environment.

201. Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contaminants before they injured Plaintiffs, the Class, and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

202.     As such, the Defendants, acting negligently, recklessly, willfully, wantonly, and/or intentionally, breached their legal duties to Plaintiffs and the Class, causing the contamination of the municipal and private well drinking water supplies in and around the residences of Plaintiffs and the Class.

203.     Defendants breached their duty to warn and notify end users of AFFF about the danger that PFOA and PFOS could enter into the environment and groundwater.

204.     Defendants breached their duty to warn by failing to notify Plaintiffs and the Class in a timely manner that PFOA and PFOS had contaminated the municipal and private well drinking water supplies.

205.     Defendants breached their duty not to contaminate the Plaintiffs' and Class Members' drinking water supplies by allowing PFOA and PFOS to be released into the municipal and private well drinking water supplies of Fountain, Security, and Widefield.

206.     Defendants breached their duties to act reasonably by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

207.     Defendants' breaches of their duties were direct and proximate causes of the drinking water in both the municipal and private well supplies to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

208.     Defendants' breaches of their duties were direct and proximate causes of the injuries, damages, and harm the Plaintiffs and the Classes have suffered to their health and property.

209. Defendants' breach of their duties to act reasonably and to timely notify and warn the Communities of the presence of PFOA and PFOS in the groundwater directly and proximately prevented Plaintiffs and the Class from undertaking effective and immediate remedial measures.

210. Plaintiffs and the Class have expended and/or will be required to expend significant financial resources to test and monitor for the presence of latent diseases for many years because of Defendants' conduct.

211. Plaintiffs and the Class have expended and/or will be required to expend significant financial resources to remediate the effects of Defendants' conduct on their homes and property for many years.

212. Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of Defendants' breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

213. Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential,

and nominal damages, flowing from the negligence that are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

## AS AND FOR A SECOND CAUSE OF ACTION: MEDICAL MONITORING

214. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

215. This cause of action is brought pursuant to Colorado law.

216. In Colorado, a claim for medical monitoring requires a Plaintiff to establish that: (1) Plaintiff has suffered a significant exposure to a hazardous substance through the tortious actions of defendant; (2) as a proximate result of this exposure, Plaintiff suffers from an increased risk of contracting a serious latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.[10]

217. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and PFOS would result in the contamination of the municipal and private well drinking water supplies of Fountain, Security, and Widefield, due to these communities' proximity to PAFB.

---

[10] *See Cook v. Rockwell International Corp.*, 755 F. Supp. 1468, 1477 (D. Colo. 1991); *see also Bell v. 3m Co.*, 2018 U.S. Dist. LEXIS 163609, *44 (D. Colo. Sept. 25, 2018) (Jackson, J.) ("reaffirm[ing] Judge Babcock's prediction that in an appropriate case, the Colorado Supreme Court would probably recognize a claim for medical monitoring absent present physical injury.").

218.    Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

219.    Years of consuming PFC-contaminated water has exposed the Plaintiffs and the Classes to PFOA, PFOS, and potentially other toxic substances as a result of the use, storage, and discharge of AFFF at PAFB.

220.    As alleged in this Complaint, given the persistence and bioaccumulative nature of PFOA and PFOS, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood of humans exposed to water contaminated with PFOA and PFOS.

221.    As alleged in paragraph 136 herein, consumption of elevated levels of PFOA/PFOS from contaminated water will lead to elevated serum PFOA/PFOS levels with evidence that for every 10 parts per trillion (ppt) consumed from contaminated water, serum levels increase by 25%, thereby causing a doubling of serum levels at 40 ppt.  Once biological uptake occurs, the clinical effect can be proximate to the exposure or following a latency or both.

222.    As alleged in paragraphs 132 and 138 herein, sustained exposure to PFOA/PFOS substantially increases the risk to the Plaintiffs and the Class Members of contracting numerous serious latent diseases. These latent diseases include but are not limited to: kidney cancer; testicular cancer; ulcerative colitis; thyroid disease; pregnancy induced hypertension (including preeclampsia); and hypercholesterolemia.

223.    Periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to detect the latent diseases in the Plaintiffs and the Class Members due

to their years of exposure to the PFOA/PFOS contaminated water and substantial increased risk of contracting the serious latent diseases alleged herein.

224.    As alleged in paragraphs 140-142 herein, medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOA and PFOS possible and beneficial.  By using the medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, qualified licensed medical professionals may predict, detect, and treat diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

225.    For the early detection of latent diseases in the Plaintiffs and Class Members, qualified licensed medical professionals may utilize the specific evaluations and/or laboratory testing of biomarker and organ system function as set forth in paragraph 141 herein.

226.    As a proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered an injury—the quantifiable costs of periodic diagnostic medical examinations and testing for the early detection of serious latent diseases.  Plaintiffs and Class Members request that the Court require Defendants to fund a Court-supervised medical monitoring plan that provides for periodic medical examinations and testing of Plaintiffs and the Class for the latent diseases caused by exposure to PFOA and PFOS, as well as payment of their attorneys' fees and expenses. Plaintiffs and the Class also request that the Court appoint a plan administrator and reserve jurisdiction to enforce the terms of the plan.

**AS AND FOR A THIRD CAUSE OF ACTION: STRICT PRODUCTS LIABILITY –**
**FAILURE TO WARN**

227.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

228.    This cause of action is brought pursuant to Colorado law.

229.    As commercial manufacturers, sellers, and distributors of AFFF, Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to human health and the environment.

230.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and PFOS was hazardous to human health and the environment.

231.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and PFOS would result in the contamination of the Communities' municipal and private well water supplies as a result of the Communities' proximity to PAFB.

232.    AFFF's persistence, mobility, bioaccumulative potential, and PFOA's and PFOS' links to numerous serious medical conditions, are not open and obvious conditions.

233.    Though Defendants knew or should have known about the seriousness of the consequences of failing to warn about the inherent dangers associated with AFFF containing PFOA and PFOS, Defendants failed to warn PAFB of the dangers inherent in the use of the product.

234.    Though Defendants knew or should have known about the reasonably foreseeable hazards to human health and welfare associated with the use of AFFF containing PFOA and PFOS in the vicinity of Plaintiffs' drinking water supplies, including contamination of public drinking water and private wells with PFOA and PFOS, Defendants failed to provide adequate warnings of, or take any precautionary measures to mitigate, those hazards.

235.    Defendants failed to provide sufficient warning that the use and storage of Defendants' product would cause the product to be released into the environment and cause the PFOA and PFOS contamination of the environment, groundwater, and drinking water.

236.    Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to Plaintiffs, the Class, and their properties.

237.    Had Defendants provided adequate warnings, Plaintiffs and the Class could have taken measures to avoid or lessen their exposure.

238.    Had Defendants provided adequate warnings, PAFB could have taken measures to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and drinking water.

239.    Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

240.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA and PFOS that came from the use, storage and disposal of AFFF at PAFB.

241.     Defendants' failure to warn was the direct and proximate result of the contamination, leading to the diminution in the value and marketability of the properties of the Plaintiffs and Property Damage Class Members.  Plaintiffs and the Class have suffered the need for and the cost of remediation of their properties and mitigation systems for those properties, and the cost of alterative water.

242.     As a result of the contamination, Plaintiffs and the Class have lost use and enjoyment of their properties and have suffered annoyance, discomfort, and inconvenience as a consequence of the contamination of their properties by Defendants.

243.     As a result of Defendants' conduct and the resulting contamination, Plaintiffs and the Classes have been injured in that their exposure to PFOA, PFOS, and potentially other toxic substances has produced an increased level of PFOA and PFOS in their blood stream, leading to the bioaccumulation of PFOA and PFOS in their bodies and significantly increasing their risk of developing numerous serious medical conditions.

244.     As a result of Defendants manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to Plaintiffs and Class Members.

245.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

## AS AND FOR A FOURTH CAUSE OF ACTION: STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

246.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

247.    This cause of action is brought pursuant to Colorado law.

248.    By virtue of manufacturing, marketing, and selling AFFF containing PFOA and PFOS, Defendants had a strict duty not to place an unreasonably dangerous product into the stream of commerce that would injure innocent bystanders in the Communities.

249.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health when it, or products containing it, were used in their foreseeable and intended manner.

250.    The chemical makeup of AFFF, PFOA, and PFOS underlying the product's hazardous characteristics involve the interpretation of technical, scientific information derived from research and testing.

251.    Knowing of the dangerous and hazardous properties of AFFF due to research and testing, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFOA or PFOS.

252.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

253.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property resulting from Defendants' manufacture, marketing, and sale of AFFF containing PFOA or PFOS.

254.    As manufacturers of AFFF, Defendants not only had the ability to alter the product in such a way that maintained the fire-fighting abilities of the product while eliminating its inherently unsafe character, but also were in the best position to do so.

255. AFFF's persistence, mobility, bioaccumulative potential, and PFOA's and PFOS' links to numerous serious medical conditions, are not open and obvious conditions or part of general public knowledge of AFFF.

256. Therefore, even though AFFF is useful for fighting hard to fight fires, the inherent risks associated with its use far outweigh any fire-fighting benefits, thereby rendering AFFF unreasonably dangerous.

257. The manufacture, sale, and distribution of unreasonably dangerous AFFF renders the Defendants' product defective.

258. Defendants' defective design and formulation of AFFF is the direct and proximate cause of the environmental and health impacts from PFOA and PFOS.

259. As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the value and marketability of the Plaintiffs' and Property Damage Class' property has been and will continue to be diminished. Plaintiffs and the Class Members have suffered the need for and the cost of remediation of their properties and/or mitigation systems for those properties, and the cost of alterative water.

260. As a direct result of the contamination, Plaintiffs and the Class Members have lost the use and enjoyment of their properties and have suffered annoyance, discomfort, and inconvenience as a consequence of the contamination of their properties by Defendants.

261. As a direct result of Defendants' defective design and formulation of AFFF, the Plaintiffs and the Classes have been injured in that their exposure to PFOA, PFOS, and potentially other toxic substances has caused them to develop numerous serious medical conditions associated

with this exposure as more fully described herein and has significantly increased their risk of developing those conditions.

262.    As a direct result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs and Class Members.

263.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

## AS AND FOR A FIFTH CAUSE OF ACTION: CIVIL CONSPIRACY

[The Court dismissed Plaintiffs' Fifth Cause of Action: Civil Conspiracy without prejudice pursuant to its Order dated September 25, 2018.  *See* ECF No. 326].

## CLAIM FOR PUNITIVE DAMAGES

264.    Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

265.    Plaintiffs and the Class assert a claim for punitive damages under C.R.S. § 13-21-102.

266.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that was done without regard to the consequences or the safety of the Plaintiffs and the Class and caused the foregoing property damage, and injuries upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

267.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure Plaintiffs and the Class in

the Communities did not ingest PFOA and PFOS, which Defendants knew were linked to numerous serious medical conditions.

268.    Defendants have caused significant harm to Plaintiffs and the Class, including harm to the properties and water supplies of Plaintiffs and the Class and have demonstrated a conscious and outrageous disregard for their safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.    an award certifying the Sub-Classes;

B.    a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and Class Members;

C.    an order requiring that Defendants implement a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Property Damage Class and, where appropriate, to implement appropriate remedial measures;

D.    an order establishing a medical monitoring protocol for Plaintiffs and the Class;

E.    an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

F.    an order for an award of attorneys' fees and costs, as provided by law;

G.    an award of pre-judgment and post-judgment interest as provided by law; and

H.      an order for all such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter so triable pursuant to

Federal Rule of Civil Procedure 38(b).

Dated: October 5, 2018                  Respectfully Submitted,

                                        **BURG SIMPSON**
                                        **ELDREDGE HERSH & JARDINE, P.C.**


                                        */s/ David P. Hersh*
                                        _____
                                        David P. Hersh
                                        Seth A. Katz
                                        Meghan C. Quinlivan
                                        D. Dean Batchelder
                                        Lisa R. Marks
                                        Kirsten N. Kube
                                        Lewis A. Osterman
                                        40 Inverness Drive East
                                        Englewood, CO 80112
                                        Telephone: (303) 792-5595
                                        Facsimile: (303) 708-0527
                                        E-mail: dhersh@burgsimpson.com
                                        E-mail: skatz@burgsimpson.com
                                        E-mail: mquinlivan@burgsimpson.com
                                        E-mail: dbatchelder@burgsimpson.com
                                        E-mail: lmarks@burgsimpson.com
                                        E-mail: kkube@burgsimpson.com
                                        E-mail: losterman@burgsimpson.com

                                        *Lead Counsel for Plaintiffs and the Putative*
                                        *Classes*

**NAPOLI SHKOLNIK, PLLC**
Paul J. Napoli
Hunter Shkolnik
Louise Caro
Tate J. Kunkle
Patrick J. Lanciotti
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
Telephone: (212) 397-1000
E-mail: pnapoli@napolilaw.com
E-mail: hunter@napolilaw.com
E-mail: lcaro@napolilaw.com
E-mail: tkunkle@napolilaw.com
E-mail: planciotti@napolilaw.com

*Liaison Counsel for Plaintiffs and the Putative Classes*

**MCDIVITT LAW FIRM**
Michael McDivitt
David E. McDivitt
19 East Cimarron Street
Colorado Springs, CO 80903
Telephone: (719) 471-3700
E-mail: mmcdivitt@mcdivittlaw.com
E-mail: dmcdivitt@mcdivittlaw.com

*Attorneys for Plaintiffs and the Putative Classes*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 5, 2018, a true and correct copy of the foregoing was filed using the Court CM/ECF system and thereby serving all counsel of record.

*/s/ Kirsten N. Kube*
Kirsten N. Kube